471 A.2d 1115

**Donald Paul COLEMAN**

v.

**Constance Jean COLEMAN.**

**No. 1643, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

March 5, 1984.

R. Martin Palmer, Jr., Hagerstown, for appellant.

E. Dale Roberts, Silver Spring, for appellee.

Argued before GILBERT, C.J., and MOYLAN and WILNER, JJ.

GILBERT, Chief Judge.

## "PER CURIAM ORDER

This cause coming on for hearing before this Court and counsel having been heard and arguments considered, it is this *8th* day of February, 1984, by the Court of Special Appeals, for reasons to be set forth in an opinion to follow, ORDERED that the Order of the Circuit Court for Montgomery County (Frosh, J.) dated January 13, 1984, be, and it is hereby affirmed. Costs to be paid by appellant. Mandate to issue forthwith."

We now explain why we affirmed the trial court.

In the Circuit Court for Montgomery County, Donald Paul Coleman filed a paper writing titled, "Petition to Preclude Termination of Life of Preborn," [1] and thereby triggered the instant controversy.

The objective of the petition was to prevent Constance Jean Coleman from having a fetus aborted. A "Temporary Restraining Order" was issued by Judge Stanley B. Frosh on January 6, 1984. The judge, however, after hearing testimony on January 13, 1984, dissolved the temporary restraining order and denied injunctive relief to the husband.

---

1. We observe that the appellant failed to include in the record extract the petition and the order from which he appealed. Those "oversights" could result in dismissal of the appeal. *See* Md. Rule 1028 b. 1 (b).

The wife did not expressly acknowledge to the trial judge or to this Court that she was pregnant at the time the husband filed his petition. The husband testified, however, that the wife was pregnant, and he introduced into evidence report No. S23815, dated January 3, 1984, from the Washington Adventist Hospital Lab which revealed that Constance Coleman had a "Positive" reaction to "Preg. Test (HCG)." A subsequent report from Convenient Medical Care, filed by the wife in this Court and bearing the date of January 16, 1984, states that the wife was not pregnant on that date. That report further discloses that the wife's "uterus" was "4–6 week size." We infer from the two reports that the wife was pregnant when the petition was filed, but we do not know when the pregnancy was terminated. It is obvious, however, that it ended on or before January 16, 1984.

■ Since the pregnancy has terminated, this case would ordinarily be moot. *Hagerstown Reproductive Health Services v. Fritz,* 295 Md. 268, 454 A.2d 846 (1983). We think that because the subject is one that will likely arise again and again, the public interest will be best served if we address the merits of the matter, thus affording some guidance to litigants and trial courts. *District 1199E, National Union of Hospital and Health Care Employees, Division of R.W.D.S.U., AFL–CIO v. The Johns Hopkins Hospital,* 293 Md. 343, 444 A.2d 448 (1982); *Mules v. Maryland Racing Commission,* 30 Md.App. 533, 353 A.2d 664 (1976).

The husband urges upon us a hexad of reasons why we should, in effect, depart from the pathway so clearly marked by the United States Supreme Court. We shall discuss each of the husband's reasons in the order in which he has posited them.

## I.

"The respondent should be enjoined from taking the life of the preborn child of the parties under Section 20–208 of the Health General Article."

The husband suggests that § 20–208(a) of the Health—General Article may somehow be controlling with respect to abortions in situations similar to that now before us. Section 20–208(a) provides, in pertinent part:

"(a) No person shall terminate or attempt to terminate or assist in the termination or attempt at termination of a human pregnancy otherwise than by birth, except that a physician licensed by the State of Maryland may terminate a human pregnancy or aid or assist or attempt a termination of a human pregnancy if said termination takes place in a hospital accredited by the Joint Commission for Accreditation of Hospitals and licensed by the State Board of Health and Mental Hygiene and if one or more of the following conditions exist:

(1) Continuation of the pregnancy is likely to result in the death of the mother;

(2) There is a substantial risk that continuation of the pregnancy would gravely impair the physical or mental health of the mother;

(3) There is substantial risk of the birth of the child with grave and permanent physical deformity or mental retardation;

(4) The pregnancy resulted from a rape committed as a result of force or bodily harm or threat of force or bodily harm and the State's Attorney of Baltimore City or the county in which the rape occurred has informed the hospital abortion review authority in writing over his signature that there is probable cause to believe that the alleged rape did occur."

The Supreme Court in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), made clear that the interest of the several States in regulating abortion procedures does not become compelling until "approximately the end of the first trimester" of the pregnancy. 410 U.S. at 163, 93 S.Ct. at 732. Until that time the woman is permitted to consult with a physician of her choice and to decide, without State interference, whether to have an abortion. *Id.* at 163, 93 S.Ct. at 732. *See also City of Akron v. Akron Center for*

*Reprod. Health, Inc.,* —— U.S. ——, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983). "From approximately the end of the first trimester of pregnancy, the State 'may regulate the abortion procedure to the extent reasonably necessary as it relates to the preservation and protection of maternal health.' *Roe,* 410 U.S. at 163, 93 S.Ct. at 731." *City of Akron,* —— U.S. at ——, 103 S.Ct. at 2493.

■ Any reading of Health-General Art. § 20–208(a) discloses that it conflicts with the decisions of the Supreme Court in *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), as well as *Roe v. Wade, supra,* and *City of Akron, supra,* in that the Maryland statute fails to delineate between terminating the pregnancy during the first trimester and any subsequent time. Because of that failure, Health-General Art. § 20–208(a) is unconstitutional insofar as it conflicts with the decisions of the Supreme Court of the United States.

## II.

"Petitioner has the right under the Ninth Amendment of the United States Constitution to take up for and defend his preborn child, including the right of that preborn child to receive interim shelter and nutrients and the right of his preborn child to be born."

The Ninth Amendment provides:

"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

■ Building upon the structure of the Ninth Amendment, the husband superimposes what he perceives to be the common law. The common law commands, he says, quoting 1 W. Blackstone, Commentaries * 447, that "[t]he duty of parents to provide for the *maintenance* of their children is a principle of natural law.... By begetting ... [the children, the parents] have entered into a voluntary obligation ... [to preserve the life] they have bestowed, .... And

thus the children will have the perfect *right* of receiving maintenance from their parents."

The husband notes in addition, that 1 W. Blackstone, Commentaries * 126 declares, "An infant in ventre sa mere, or in the mother's womb, is supposed in law to be born for many purposes."

The argument made by the husband contains several "built in" defects. First, the United States Constitution does not provide, as does that of Maryland, for a retention unto the people of their rights at common law, as they existed in July 4, 1976. *See* Constitution of Maryland, Declaration of Rights, Art. 5. "Whether a clause in the Constitution is to be restricted by the common law as it existed when the Constitution was adopted depends on the terms and the nature of the clause." *United States v. Wood,* 299 U.S. 123, 142, 57 S.Ct. 177, 183, 81 L.Ed. 78 (1936). The Federal Constitution, therefore, is not necessarily interpreted in light of the English common law.

Second, not all States have a system of law based on the Common Law of England. Some States are considered "Code States," and Louisiana law is bottomed on the Napoleonic Code. Furthermore, whatever federal common law exists does so "untrammeled by state court decisions," *O'Brien v. Western Union Telegraph Co.,* 113 F.2d 539, 541 (1940). The husband's contention, if adopted, would place the citizens of a common law State in a different class than those in code States and federal decisions on a different footing than State decisions.

Third, the Supreme Court, the final arbiter of what the Constitution says and means, has stated flatly that the Ninth and the Fourteenth Amendments yield a privacy right in the woman, and it has not decreed that a father's right to defend his unborn child is paramount, at least during the first trimester.

Fourth, at common law, life began "in contemplation of law as soon as an infant is able to stir in the mother's womb," 1 W. Blackstone, Commentaries * 129, and abortion

before *quickening,* that is "the stage of pregnancy when the fetus can be felt to move," [2] was not an indictable offense.[3] *Roe v. Wade,* 410 U.S. at 132, n. 21, 93 S.Ct. at 716, n. 21. Thus, there was no prohibition at common law against abortion so long as the fetus had not quickened. It is apparent that the common law foundation of the husband's Ninth Amendment argument is without basis, at least until the quickening of the fetus, an event that apparently does not occur until just "prior to approximately the end of the first trimester." *Roe v. Wade,* 410 U.S. at 164, 93 S.Ct. at 732.

At the expense of repetition, the Ninth Amendment confers no rights upon the husband in derogation of the wife's Ninth and Fourteenth Amendment prerogatives.

## III.

"An injunction is proper, since the proposed abortion is non-therapeutic and the Supreme Court decisions confer no right to non-thereapeutic abortions."

The husband argues that there was no health justification for an abortion in this case. To bolster that assertion he relied upon a dissenting opinion by Justice Stevens in *Harris v. McRae,* 448 U.S. 297, 316, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). Justice Stevens's dissent is just that, a dissent; it is not binding on anyone. That Justice Stevens disagrees with the majority of the Court of which he is a member as to when a woman is or should be entitled to an abortion does not mean we are free to pick and choose which of two or more divergent views we shall follow. In matters of interpretation of federal constitutional law, our decisions are dictated by what the Supreme Court has decreed.

---

**2.** The American Heritage Dictionary of the English Language (1970 Ed.) p. 1071.

**3.** "Whether abortion of a *quick* fetus was a felony at common law or even a lesser crime is still disputed." *Roe v. Wade, supra,* 410 U.S. at 134–136, 93 S.Ct. at 717–18.

■ Implicit in this, the husband's third argument, is that he has standing to enjoin the wife from having an abortion. The husband has no such standing inasmuch as the Supreme Court has determined that a husband's consent to a wife's abortion, during the first trimester, is unnecessary, *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), and any attempt by a State to confer such a statutory right is "absolutely and totally prohibited . . . during the first trimester of pregnancy." *Id.*

■ The husband, in the matter now before us, was constitutionally prohibited from enjoining the abortion of the wife.

## IV.

" 'Abortion on demand' was never mandated by the Supreme Court and the rights of the father must appropriately prevail."

■ Undoubtedly, "abortion on demand" was not mandated by the Supreme Court. That august body made that pellucid in *Roe v. Wade,* 410 U.S. at 163, 93 S.Ct. at 732, and in *Doe v. Bolton,* 410 U.S. at 189, 93 S.Ct. at 746. Both of those cases make crystalline, however, that a woman in the first trimester of pregnancy, in consultation with her physician, may elect to terminate the pregnancy, and neither the State nor the woman's spouse nor the father of the child has any right to intervene so as to prevent her decision from becoming fact. *City of Akron v. Akron Center for Reprod. Health, Inc.,* 103 S.Ct. at 2492. Of course, the State may validly require that "the woman . . . provide . . . informed written consent to the abortion and the physician . . . keep certain records . . . ." *Id.* at 2493. Even the implementation of those "minor regulations on the abortion procedure during the first trimester [of the pregnancy] may not interfere with physician-patient consultation or with the woman's choice between abortion and childbirth." *Id.* at 2493. The State retains an interest in protecting the woman's health

during the first trimester by assuring that the person who performs the abortion is medically competent and that the procedure is performed under circumstances that afford the woman maximum safety. *Id.* at 2492, n. 12. *See also Connecticut v. Menillo,* 423 U.S. 9, 11, 96 S.Ct. 170, 171, 46 L.Ed.2d 152 (1975).

■ Although a woman may not be constitutionally entitled to an "abortion on demand," she is most definitely entitled, as a matter of right, to a medically induced abortion during the first trimester, notwithstanding the objections of the State or any other person, firm, corporation or association.

## V.

"Science, which is more quixotic and mercurial than the law, has changed the holding of *Roe* by virtue of changing the definition of viability therein."

The gist of the husband's change of viability argument is that medical science has steadily advanced in scope and knowledge in the eleven years since the decision in *Roe v. Wade, supra,* and that *Roe's* trimester rule is no longer a proper test. The Court, in *Roe,* said, 410 U.S. at 163, 93 S.Ct. at 731:

"With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb. State regulation protective of fetal life after viability thus has both logical and biological justifications. If the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother."

■ In the circuit court the husband offered testimony from a Professor of Fundamental Genetics of the Faculty of Medicine of Paris, France, as to when viability begins. The professor testified that "the viability of the fetus is there

just after fecundation [fertilization]." The professor's definition conflicts with the viability definition in *Roe v. Wade, supra.* Moreover, the evidence was not clear that the fetus can presently live outside the womb accounting from the moment of fertilization. Transpicuosly, the professor's definition differs radically from that of the Supreme Court. The time may come when the Supreme Court decides that the *Roe v. Wade* viability test needs to be modified in light of then current medical knowledge, but that day had not arrived when the Supreme Court on June 15, 1983, a little more than six months ago, decided *City of Akron v. Akron Center for Reprod. Health, Inc., supra.* There the Court repeated:

"Medical evidence suggests that until approximately the end of the first trimester, the State's interest in maternal health would not be served by regulations that restrict the manner in which abortions are performed by a licensed physician . . . .

The *Roe* trimester standard thus continues to provide a reasonable legal framework for limiting a State's authority to regulate abortions . . . ." 103 S.Ct. 2492, n. 11.

The husband's evidence did not establish that medical science has generally accepted as true that the fetus, during the first trimester, is capable of meaningful life outside the mother's womb. Theories that such a fetus could survive under ideal circumstances and conditions are currently just that—theories.

## VI.

"Recognition of a limited power in equity courts does not 'unduly burden' any right."

The husband under the guise of the above quoted contention, and by way of ingenuity, revisits the previous arguments and reasserts that which he has already articulated. We shall not, however, repeat the journey but will summarize what we have already said. During the first trimester a mother's prerogative to have an abortion is based on her

constitutional right to privacy and is not subject to a veto by her spouse or the natural father or the State. *Roe v. Wade, supra; Rothenberger v. Doe,* 149 N.J.Super. 478, 374 A.2d 57 (1977); *Doe v. Zimmerman,* 405 F.Supp. 534 (M.D.Pa.1975); *Doe v. Bellin Memorial Hospital,* 479 F.2d 756 (7th Cir.1973); *Wolfe v. Schroering,* 541 F.2d 523 (6th Cir.1976). Judge Frosh properly dismissed the husband's petition for an injunction.

A final word is in order: That we have considered the appellant-husband's cause on the merits does not foretell that he will be able to pursue the matter from appellate court to appellate court until it is ultimately considered by the United States Supreme Court. Indeed, in view of the fact that the record before us does not support a change in the first trimester rule announced in *Roe v. Wade, supra,* iterated in *Planned Parenthood of Central Mo. v. Danforth, supra,* and reiterated in *City of Akron v. Akron Center for Reprod. Health, Inc., supra,* it is doubtful that certiorari would be granted by the Supreme Court.