489 A.2d 1130

**MERCY HOSPITAL, INC.**

v.

**Ernestine JACKSON.**

**No. 447, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

April 4, 1985.

Michael J. Travieso and Christopher J. Fritz, Baltimore (Gallagher, Evelius & Jones, Baltimore, on the brief), for appellant.

Stephen H. Sachs, Atty. Gen., Eleanor M. Carey, Deputy Atty. Gen., Diana G. Motz, and Peter E. Keith, Asst. Attys. Gen., Baltimore, for amicus curiae, of the State of Md.

Barbara Mello, Baltimore, for appellee.

Argued before GILBERT, C.J., and ADKINS and ROSALYN B. BELL, JJ.

GILBERT, Chief Judge.

In this appeal we are asked to determine whether a competent, conscious, rational adult may be required, in spite of religious beliefs, to submit to a blood transfusion.

Ernestine Jackson was admitted to Mercy Hospital on an emergency basis on February 26, 1984. Mrs. Jackson was 25 or 26 weeks into her pregnancy and was undergoing premature labor. The examination of Mrs. Jackson by Mercy's medical staff revealed that a routine vaginal delivery would create serious and dangerous medical complications for both Mrs. Jackson and the unborn child. The fetus was lying in the womb in an "oblique to transverse position," and the risk of a ruptured uterus was great because Mrs. Jackson had previously undergone a myomectomy [1] because of her having given birth prematurely on a prior occasion. Mercy's diagnosis suggested an abdominal, or Caesarean section, delivery.

A Caesarean delivery is a relatively safe and routine, albeit surgical, form of childbirth. The most serious drawback—the surgical intervention prescribed in the matter now before us—is that the mother inevitably loses a certain, but not predeterminable, quantity of blood. In the instant case, it was the contemplated loss of blood together with the attendant risks that injected the legal profession into an otherwise sterile medico-monopolistic delivery room.

We explain. Mrs. Jackson is by religious persuasion a Jehovah's Witness. One of the tenets of that faith is that a believer may not, under any circumstances, receive blood transfusions. Members of Mercy's medical staff counselled Mrs. Jackson that there was a 40 to 50 percent chance she would need a transfusion. If that need developed and if there were no transfusion, the doctors told her that they thought it likely she would die during a Caesarean delivery. Mrs. Jackson, nevertheless, steadfastly refused to compro-

---

**1.** A removal of a section of muscle tissue from the uterine wall, resulting in a weakening of the uterus.

mise her religious beliefs.  She requested that the Caesarean delivery proceed [2] without blood transfusions.  Mrs. Jackson's husband was with his wife at Mercy and he, also a Jehovah's Witness, wholeheartedly supported her position.

Mercy adjudged the risk that Mrs. Jackson had assumed to be medically unacceptable.  As a result, its counsel immediately orally petitioned the Circuit Court for Baltimore City (Greenfeld, J.) for the appointment of a guardian for Mrs. Jackson with authority in the guardian to consent to blood transfusions to Mrs. Jackson.  Judge Greenfeld appointed counsel for Mrs. Jackson and then convened a court hearing at her bedside in the hospital.  Some physicians on Mercy's staff testified with respect to the life threatening condition that Mrs. Jackson was precipitating as a result of her steadfast refusal to be transfused.  Mrs. Jackson and her husband told Judge Greenfeld of their firm religious convictions and their decision to proceed with the surgical intervention, sans transfusion, despite the potentially fatal risk entailed.  Judge Greenfeld denied Mercy's application for guardianship, and the operation occurred without the use of transfusions.  Mrs. Jackson and her child survived the surgery.

It is from the denial of the appointment of a guardian for Mrs. Jackson that Mercy brings this appeal and posits to us the single question:

"Did the ... [circuit] court err in holding that a competent, pregnant adult has a paramount right to refuse consent to a blood transfusion on the basis of her religious beliefs in the circumstances presented in this case?"

The hospital vigorously contends that the "sole issue" before this Court devolves to deciding whether Judge

---

2.  The record reveals that the medical staff at University of Maryland Hospital, not a party to this appeal, concurred with the finding of a high risk of mortality if Mrs. Jackson did not permit transfusion.  It was evidently for that reason that Mrs. Jackson was rushed from that facility to Mercy Hospital.  The circuit court found that despite the risks to the mother, delivery by Caesarean section without blood transfusions posed virtually no threat to the health of the fetus.

Greenfeld erred as a matter of law in balancing certain competing State interests [3] against Mrs. Jackson's right to freedom of religion under the First Amendment to the Constitution of the United States, and then finding in Mrs. Jackson's favor.

Viewing the matter from an entirely different perspective, Mrs. Jackson has moved to dismiss this appeal because there is no actual controversy between the parties; there is no remedy which this Court may fashion between Mercy and Mrs. Jackson. Patently, Mrs. Jackson has already undergone the surgery. In her words, she "no longer requires medical attention of the sort at issue here, and if she did, would be extremely unlikely to seek it from [Mercy Hospital]." In sum, Mrs. Jackson states that the issue is moot and should be dismissed. Md.Rules 1035 b. 8 and 1036 d.

■ The threshold issue in the matter at bar is, inescapably, that of mootness. Inasmuch as the surgery was concluded, the child born, and the patient discharged, this case would ordinarily be found not judiciable. *See Hamilton v. McAuliffe*, 277 Md. 336, 353 A.2d 634 (1976). Mercy and the Attorney General [4] urge that we not dismiss the appeal for mootness, but that we address it because the issue is likely to arise again and again. Because of the probability of repetition and the substantial likelihood that the matter will always be moot by the time it reaches an appellate court, we deem it to be in the public interest for us to answer Mercy's question. *See Coleman v. Coleman*, 57 Md.App. 755, 758, 471 A.2d 1115, 1117 (1984).

■ Mercy Hospital argues to this Court that, "Mercy is a private, non-profit, Catholic hospital which is run by the Sisters of Mercy, a Catholic religious order," and that it is

---

**3.** This Court ordered the Attorney General to appear as an *amicus curiae* on behalf of the State of Maryland. Md.State Gov't Code Ann. § 6–106(a) and (b).

**4.** *See* n. 3 *supra.*

affiliated with the Roman Catholic Church in the United States. Despite the absence of testimony to that effect before the circuit court, Mrs. Jackson has stipulated that the hospital's self-portrayal is accurate. Mercy says that it "is dedicated to the preservation of life and family through the provision of medical services...." Nevertheless, Mercy may not properly complain that Mrs. Jackson's religious beliefs were upheld to the detriment of the hospital's own religious convictions.[5] The State, in this case personified by the circuit court judge, must "be a neutral in its relations with groups of religious believers and non-believers." *Atlantic Department Store, Inc. v. State's Attorney*, 22 Md.App. 381, 387, 323 A.2d 617, 620 (1974), citing *School District of Abington Tp. Pa. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (also cited as *Murray v. Curlett*); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

■ Freedom of religion means the right to pursue one's religious beliefs without interference from any other religion, non-religion or the government. *Montgomery County Department of Social Services v. Sanders*, 38 Md.App. 406, 416 n. 10, 381 A.2d 1154, 1161 n. 10 (1978) (citations omitted).

> "No chapter in human history has been so largely written in terms of persecution and intolerance as the one dealing with religious freedom. From ancient times to the present day, the ingenuity of man has known no limits in its ability to forge weapons of oppression for use against those who dare to express or practice unorthodox religious beliefs. And the Jehovah's Witnesses are living proof of the fact that even in this nation, conceived as it

---

5. In connection with this conflict between religious precepts, the thoughts of a Catholic cardinal on the subject seem appropos.

"Catholics do not need the support of civil law to be faithful to their own religious convictions and they do not seek to impose by law their moral views on other members of society."

Richard Cardinal Cushing, Editorial—"Cushing on Law and Morality," *The New York Times*, March 4, 1965, p. 30 C, col. 1.

was in the ideals of freedom, the right to practice religion in unconventional ways is still far from secure."

*Prince v. Massachusetts,* 321 U.S. 158, 176–76, 64 S.Ct. 438, 447, 88 L.Ed. 645, 657 (1944) (Murphy, J., dissenting).

■ Although the First Amendment [6] precludes the State from interfering with the religious beliefs of its citizens, the State may nevertheless intervene in those instances where a compelling State interest is jeopardized by a practice generated by a religious impetus. *See McMillan v. State,* 258 Md. 147, 265 A.2d 453 (1970). For example, the State's interest in the safety and well-being of minors may compel medical treatment for a child despite objections by the parents that are based upon their religious beliefs. *See Craig v. State,* 220 Md. 590, 155 A.2d 684 (1959) (statutory duty imposed by former Md.Ann.Code art. 72A § 1 (now Md.Family Law Code Ann. § 5–203(b)(1)) requires parents to provide reasonable medical treatment to minor children even when such treatment is antithetical to the religious beliefs of the parents); *accord Levitsky v. Levitsky,* 231 Md. 388, 190 A.2d 621 (1963) (religious beliefs of mother, a Jehovah's Witness, could not overcome the State's interest in the welfare of her child, and blood transfusions for the minor were properly ordered); *see also Snyder v. Holy Cross Hospital,* 30 Md.App. 317, 352 A.2d 334, *cert. denied,* 276 Md. 750 (1976) (State's interests in peace, health, and good order found sufficiently compelling to override religious objections of father against autopsy of son's body).

■ The State of Maryland, as we have seen, participated in this appeal by submitting a written brief as *amicus curiae,* and despite Mercy's assertions to the contrary, pointed out that any State interest in the preservation of life is not necessarily absolute. After a thorough review of a number of cases in Maryland, and other jurisdictions,

---

**6.** The First Amendment of the United States Constitution is made applicable to the States by the Fourteenth Amendment, *see Hopkins v. State,* 193 Md. 489, 496, 69 A.2d 456, 459 (1949), *appeal dismissed,* 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357 (1950); see *also* Maryland Constitution, Declaration of Rights, Article 36.

which have addressed free exercise of religion *vis-a-vis* the right to refuse medical treatment, the Attorney General summarized: "[T]he compelling need to preserve life is itself limited by society's demand for recognition of fundamental individual liberties." *See also,* Cantor, *A Patient's Decision to Decline Life-Saving Medical Treatment: Bodily Integrity Versus the Preservation of Life,* 26 Rutgers L.Rev. 228 (1973).

The State's characterization of its interest in the preservation of human life as being a qualified one is buttressed by previous pronouncements on the subject by Maryland legislation. Md.Health Gen.Code Ann. § 20–107, the statute addressing consent for medical treatment upon individuals who lack the capacity or present ability to make their own decision provides, in pertinent part: [7]

"(a) *Definitions* —(1) In this section the following words have the meanings indicated.

(2) In this section, 'disabled individual' means an individual who lacks sufficient understanding or capacity to make or communicate a responsible decision on health care for the individual because of:

(i) A physical disability;

(ii) Chronic alcoholism;

(iii) Drug addiction;

(iv) A disaease; or

(v) A mental disability, including senility.

. . . .

(b) *Scope of section.—This section does not authorize any treatment of a disabled individual if the health care provider knows that the treatment is against the religious belief of the disabled individual.*

---

[7]. We are cognizant that Mrs. Jackson was at all times able to formulate and articulate her own decisions regarding the medical procedures she would and would not undergo. This is, of course, the crux of the matter before us—Mercy's appeal stems from Judge Greenfeld's order that Mrs. Jackson, not Mercy, should be allowed to make the final decision regarding what medical invasions would be made to her body.

....

(f) *Same [Substituted consent]—When not allowed.* —The substituted consent provided for by subsection (d) of this section may not be given:

....

(2) *If the health care provider is aware that the person for whom the health care is proposed has expressed disagreement with the decision to provide health care....*" (Emphasis supplied.)

Each of the above quoted sections of the statute embodies an emphatic legislative mandate that the patient's decision regarding the type of treatment the patient shall endure is paramount. The statute goes so far as to declare that, in the final analysis, it is the patient who determines whether there shall be any treatment at all.

The protection afforded the able or competent adult can hardly be less than that accorded by the legislature to the disabled.[8]

As we have said, Mrs. Jackson was competent to provide consent at all pertinent times, and her baby was never at risk because of the refusal to allow a blood transfusion. In his denial of Mercy's petition for a guardian for Mrs. Jackson, Judge Greenfeld said:

---

**8.** All hospitals in this State operate within boundaries delineated by the "Patient's Bill of Rights." Included within that document are the following provisions:
"PATIENT RIGHTS.

....

*Consent* The patient has the right to reasonably informed participation in decisions involving his health care. To the degree possible, this should be based on a clear, concise explanation of his condition and of all proposed technical procedures, including the possibilities of any risk of mortality or serious side effects, problems related to recuperation, and probability of success. The patient should not be subjected to any procedure without his voluntary, competent, and understanding consent, or that of his legally authorized representative. Where medically significant alternatives for care or treatment exist, the patient shall be so informed.

....

"This Court is of the opinion that a competent, pregnant adult does have the paramount right to refuse a blood transfusion in accordance with her religious beliefs, where such decision is made knowingly and voluntarily and will not endanger the delivery, survival or support of the fetus. This conclusion is consistent with a patient's right of informed consent to medical treatment, *Sard v. Hardy*, 281 Md. 432, [379 A.2d 1014] (1977), and the corollary right to refuse that medical treatment."

We agree.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

*Refusal of Treatment* The patient may refuse treatment to the extent permitted by law. When refusal of treatment by the patient or his legally authorized representative prevents the provision of appropriate care in accordance with ethical and professional standards, the relationship with the patient may be terminated upon reasonable notice.

PATIENT RESPONSIBILITIES.

. . . .

*Refusal of Treatment* The patient is responsible for his actions if he refuses treatment or does not follow the practitioner's instructions."
(*See Accreditation Manual for Hospitals 1982*. Joint Commission on Accreditation of Hospitals (1982)).

Those "rights" have been made applicable to the hospitals within the State. *See* Health-Gen. § 19–308(a)(1) and COMAR § 10.07.01.09.