**Jean M. WACHTER, et al.**

v.

**UNITED STATES of America.**

**Civ. No. S–87–2118.**

United States District Court,
D. Maryland.

June 23, 1988.

Nicholas Gilman, John S. Miles, Smiley, Olson, Gilman & Pangia, Washington, D.C. and Robert T. Hall, Hall, Markle & Sickels, P.C., Fairfax, Va., for plaintiffs.

Breckinridge L. Willcox, U.S. Atty., Juliet A. Eurich and Billy S. Bradley, Asst. U.S. Attys., Baltimore, Md., and Lt. Commander Michael Curreri, Office of Staff Judge Advocate, NMCNCR, Bethesda, Md., for defendant.

## MEMORANDUM

SMALKIN, District Judge.

### I.

This case is now before the Court on the defendant's motion for summary judgment, or, in the alternative, to dismiss the complaint. The plaintiffs have opposed the motion in a fashion fully consistent with Fed. R.Civ.P. 56(e), including the submission of the affidavit of plaintiffs' medical expert. Therefore, the Court will treat the matter as a motion for summary judgment. The plaintiffs have filed a cross-motion for partial summary judgment. No oral hearing is deemed necessary. Local Rule 6, D.Md.

Plaintiffs Jean Wachter and her husband commenced this case under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*, by complaint filed August 6, 1987, after proper exhaustion of administrative

remedies. The complaint asserted four counts, as follows:

Count I—Lack of informed consent as to coronary artery bypass graft (CABG) surgery with saphenous veins in March and August, 1983 on plaintiff Jean Wachter at a Naval medical facility;

Count II—Medical negligence on the part of Dr. Billig;

Count III—Lack of supervision of Dr. Billig; and

Count IV—Negligent credentialing of Dr. Billig.

The plaintiffs seek three million dollars ($3,000,000.00) in damages.

In their response to defendant's motion, plaintiffs have moved voluntarily to dismiss Counts II, III, and IV pursuant to Fed.R. Civ.P. 41(a)(2). The Court perceives utterly no merit in those claims, and there is no alternative forum in which they can be brought. In short, there is no life left in them at all. The Court is persuaded, then, to exercise its discretion in favor of a prejudicial, rather than a nonprejudicial, dismissal. *See* 9 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2367, at 184 (1971).

The only remaining count is Count I, and only so much of that count as deals with informed consent with respect to the August, 1983 surgery remains viable. *See* plaintiffs' response to defendant's motion for summary judgment at ¶ 3.

In view of this narrowing of the issues, the only legal question is whether the Court can appropriately direct a verdict for the defendant on the plaintiffs' claim of lack of informed consent under Maryland law, were this case in a directed verdict posture. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986). (Under *Anderson* and the FTCA, Maryland's substantive law gives the rule of decision.) It is the plaintiff's burden, under the rule in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), to produce evidence, apart from the allegations of the complaint, in support of her claim of lack of informed consent. 477 U.S. at 322–24, 106 S.Ct. at 2552–53.

## II.

■ First, the Court discusses plaintiffs' suggestion that the concept of informed consent encompasses representations as to a surgeon's competence, experience, or track record. In a prior case also arising from surgery performed on a patient by Dr. Billig, this Court held that a plaintiff's attempt to bring an "informed consent" claim under Maryland law (as set forth in *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977)), for a surgeon's alleged failure to disclose his incompetence (or for his misrepresentations of his competence) was barred by 28 U.S.C. § 2680(h). Section 2680(h) expressly excludes misrepresentation claims from the FTCA's waiver of sovereign immunity. *Shock v. United States,* 689 F.Supp. 1424, 1425–26 (D.Md. 1988) (copy attached as Appendix). After reconsideration of the cases cited by the parties, the Court still is of the opinion that misrepresentations peculiar to the person of the surgeon or physician are just that— misrepresentations—and cannot be brought under the FTCA by recasting them in the guise of a negligence action based on lack of informed consent.

## III.

■ Even were the Court to accept plaintiffs' argument that misrepresentations as to the physician's competence do not fall within the misrepresentation exclusion of 28 U.S.C. § 2680(h), plaintiffs' claim would still fail on the merits. No case of lack of informed consent is made out unless the failure to disclose an "alternative" to the treatment that the patient chooses to undergo is the proximate cause of damage to the plaintiff. *See Sard v. Hardy,* 281 Md. at 448–49, 379 A.2d at 1024–25. In this case, plaintiffs do not suggest that, had they been aware of Dr. Billig's prior record, Mrs. Wachter would have chosen a different procedure (or no procedure). Plaintiffs admit to having acquainted themselves completely with the procedures involved in, and the risks associated with, a repeat bypass grafting as well as the alternative of angioplasty. In fact, plaintiffs have admitted that Mrs. Wachter would

still have had repeat coronary artery bypass surgery in August, 1983, even with the benefit of the 100 per cent hindsight acquired during the course of this litigation (J. Wachter depo. at 118; R. Wachter depo. at 31–32). Plaintiffs argue that Mrs. Wachter was damaged as a result of undergoing the procedure without knowledge of Dr. Billig's physical limitations. In order to establish a causal connection between an alleged failure to obtain informed consent and damages suffered, Maryland law requires the following:

> 1. That the plaintiff must identify an undisclosed risk which would have altered her decision to undergo the treatment had it been disclosed; [and]
>
> 2. That plaintiff must show that the particular risk materialized and caused injuries for which she seeks recovery.

*Lipscomb v. Memorial Hospital,* 733 F.2d 332, 338 (4th Cir.1984).

The only risk that materialized in this case was that the grafts were unsuccessful. The plaintiffs admit to having been informed of the possibility of this result. Plaintiffs argue that, had they been informed of Dr. Billig's physical problems, they would have chosen another doctor. Therefore, the "undisclosed risk" involved was the risk that Dr. Billig would somehow make a mistake, or perform the surgery in an incompetent manner. Plaintiffs have not shown that this "risk" materialized. Dr. Brickman, plaintiffs' medical expert, testified at his deposition that he thought the operation would have had a better outcome if performed by a different surgeon (Brickman depo. at 42–46). As the basis for his opinion, Dr. Brickman testified that he "suspected" that Dr. Billig's physical limitations precluded him from performing internal mammary artery grafting, a technique that Dr. Brickman suggested would have been better than the technique used. (Plaintiffs' claim of lack of informed consent as to the use of internal mammary artery grafting will be discussed fully *post.*) Asked if he held that opinion to a reasonable degree of medical certainty, Dr. Brickman responded "No. That's speculation." (*Id.* at 47). The following exchange ensued:

> Q. Specifically, regarding this operation, then, is it true that you were aware of no specific aspect of the conduct of the surgery which was inadequate in that it led to an injury which was the result of [sic] this or any other impairment that you're referring to?
>
> A. From my perusal of the records, I could discern none. That does not mean it is not there, it's just that I can't find it from perusing the records.

(*Id.*)

In sum, nothing in either the testimony of the plaintiffs or of Dr. Brickman is sufficient to allow a reasonable fact finder to conclude that the allegedly undisclosed risk in this case—Dr. Billig's lack of surgical skill—materialized and caused injuries for which the plaintiffs could recover. Dr. Brickman's conclusion is, as he admitted in his deposition, pure speculation. Obviously, this speculation cannot satisfy plaintiffs' burden to produce evidence sufficient to ward off summary judgment under *Celotex.*

### IV.

■ The only issue remaining with regard to informed consent is whether there was a lack of informed consent due to the Navy physicians' failure to inform the plaintiffs of the possible use of the internal mammary artery (IMA) to supply the grafted vessel, instead of the saphenous vein. If there is a genuine dispute of material fact on this issue, the matter must proceed to trial.

It is true that both this Court and the Fourth Circuit have recognized that an informed consent case is made out if a plaintiff can show proximately resulting damages from a failure to disclose "the nature of available alternatives to the operation, including the respective failure rates for such alternative procedures, and the risks of harm inherent in the alternative procedures." *Lipscomb v. Memorial Hospital,* 733 F.2d at 337. There appears to be a paucity of case law with regard to what constitutes an alternative about which the patient ought to be informed. Even though the opinion of the Court of Special

Appeals in *Mercy Hospital, Inc. v. Jackson*, 62 Md.App. 409, 489 A.2d 1130 (1985), is of no precedential weight, having been vacated on other grounds, 306 Md. 556, 510 A.2d 562 (1986), this Court is of the opinion that the Maryland courts, were they faced with the question, *cf. Wilson v. Ford Motor Co.*, 656 F.2d 960 (4th Cir.1981), would look to the language in the "Patient's Bill of Rights" as establishing an appropriate standard. This Bill of Rights requires only that the physician inform the patient of *"medically significant alternatives"* for care or treatment...." 62 Md.App. at 417 n. 8, 489 A.2d at 1134 n. 8 (emphasis added). Thus, the question is whether there is a genuine dispute of material fact as to whether the Navy physicians were under a duty to disclose, as a "medically significant alternative," the use of the internal mammary artery as a graft source instead of saphenous veins.

Dr. Brickman has admitted, in his affidavit (Exhibit 2 to Plaintiffs' Memorandum in Opposition), that "IMA bypass grafts as an alternative to saphenous vein grafts" were "not commonly used throughout the United States in July, 1983...." In his deposition, Dr. Brickman also admitted that only a few hospitals in the country, out of hundreds that perform CABGs, were "aggressive" in the use of IMA grafts (Brickman depo. at 22) and that it was not either generally accepted among surgeons nor statistically established in the summer of 1983 that IMA grafts were superior to saphenous vein grafts for reoperative patients (*Id., passim.*). Additionally, in his deposition at 31 and 33, Dr. Brickman admitted that he was not aware of medical literature showing that a patient in Mrs. Wachter's situation would benefit more from an IMA graft than from a saphenous vein graft. Nothing in Dr. Brickman's affidavit establishes that he has, in the interim, discovered any literature specifically showing that the IMA procedure would have been more advantageous to this particular patient than the saphenous procedure. The article submitted as part of his affidavit does not clearly establish that proposition. In fact, it shows considerable disagreement among surgeons as to whether one procedure was better than the other, the surgical opinions summed up by Dr. Jones in closing: "[I]t looks about even. It is not a controversy—it is just a matter of applying our knowledge best." (Brickman affidavit at 6).

The adequacy of Dr. Brickman's bare conclusions in his affidavit—that plaintiff would have been "an ideal candidate for an IMA graft"—is belied not only by his deposition testimony and the very article he submitted in support of his affidavit, but also by the unanimous opinions of defendant's well-qualified experts that, in July and August, 1983, the IMA procedure was not in general use, was not then known among surgeons to produce better results, and was not the subject of any definitive study showing it would be better than a saphenous vein graft. Most importantly, defendant's experts pointed out that there was no evidence that an IMA graft would have been of any value in this patient, who was having a double bypass. None of these assertions is put in genuine dispute by Dr. Brickman's various statements, and the Court is convinced, in considering the medical evidence from both sides, that there simply is no issue for trial regarding whether plaintiff ought to have been advised of the IMA alternative.

**V.**

In this Court's opinion, Maryland law does not require that a surgeon inform a patient about, or obtain the patient's consent to, the details or mechanical means of performing an operation. Rather, the purpose of the informed consent requirement is to assure that the patient is informed of alternative treatments, such as surgery versus radiation or chemotherapy, or radical versus less radical resection. Given the indisputable fact in this case that the IMA versus saphenous vein controversy was not settled at the time, the question of which vein to use was simply not one that ought to have been put to the patient, under any possible construction of Maryland law. The use of the IMA instead of the saphenous vein did not constitute, in this Court's opinion, a "medically significant alternative for care or treatment," but, rather, merely a question for the surgeon's judgment as to the manner or means of performing a

**1424**

particular operation, *viz.*, the coronary artery bypass graft. It is inconceivable to this Court that Maryland case law would require, for informed consent, that the surgeon discuss, and obtain consent beforehand as to, the tactical details of the surgery, such as the location of incision, the techniques of surgery, the type of sutures, the source of a graft, or other details of the operation. Such a requirement would be overly burdensome to the physician and would add nothing to the ability of a lay patient to give informed consent to surgery as versus some other medically available procedure. It is to the informed making of that decision, *viz.*, surgery versus other treatment modalities, to which the Patient's Bill of Rights and Maryland cases such as *Sard v. Hardy* are aimed. In short, this case presents only a choice of tactical surgical approaches, rather than a choice among treatment modalities, and, thus, it presents no issue of lack of informed consent.

### VI.

Finally, the question of angioplasty versus bypass surgery, addressed in the Brickman affidavit, is immaterial, given the indisputable fact in this case that the plaintiff knew of the existence of angioplasty, but made an informed decision to have a repeat bypass graft instead and would still have had it with the benefit of 100 per cent hindsight, as fully discussed above.

An order will be entered separately, dismissing Counts II, III, and IV of plaintiffs' complaint, with prejudice, and granting defendant's motion for summary judgment on Count I.*

---

* Because of the disposition of defendant's motion, there is no need to address the plaintiff's cross-motion for partial summary judgment as to Count I of the complaint.