Dewayne SCHMIDT and Maleta
Schmidt, Appellant–
Defendants,

v.

MUTUAL HOSPITAL SERVICES,
INC. Appellee–Plaintiff.

No. 41A04–0409–CV–521.

Court of Appeals of Indiana.

Aug. 10, 2005.

Carrie J. Miles, Franklin, IN, for Appellants.

Gary Schiffli, Indianapolis, IN, for Appellee.

## OPINION

ROBB, Judge.

Dewayne and Maleta Schmidt (collectively, the "Schmidts") appeal from the trial court's order granting summary judgment to Mutual Hospital Services, Inc., as agent for St. Francis Hospital and Health Centers ("Mutual Hospital Services"), on Mutual Hospital Services' complaint for collection of a debt. We affirm.

### Issue

The Schmidts raise two issues for our review, which we consolidate and restate as the following: whether the trial court properly granted summary judgment to Mutual Hospital Services.

### Facts and Procedural History

The Schmidts are members of the General Assembly and Church of the Firstborn and believe, among other things, in trusting God rather than medicine for healing. In early September of 1999, when Maleta was approximately seven months pregnant with the Schmidts' first child, she began to experience complications with the pregnancy. Dewayne, following the teachings of their religion, called upon the elders of their church to pray for Maleta, and many members of the church came to the Schmidts' home to pray and provide support.

In the afternoon of September 8, 1999, members of the Johnson County Sheriff's Department arrived at the Schmidts' home after receiving an anonymous phone call reporting concern for Maleta's condition. Johnson County deputies observed Maleta's condition and called for an ambulance to take her to the hospital. Dewayne explained to the deputies the details of their faith and that he did not consent to Maleta being taken to the hospital.[1] He also explained that he does not carry health insurance and would not pay for any services provided by the hospital.

Maleta was transported to St. Francis Hospital's South Campus in Southport, where she was diagnosed as pre-eclamptic,[2] and a Caesarean section was ordered. Dewayne did not give his consent to the surgery and informed hospital staff that he did not have health insurance and would not pay for any medical treatment. The Schmidts' daughter, Makalynn, was delivered by Caesarean on September 8, 1999. Thereafter, Maleta spent seven days in the Intensive Care Unit at the hospital's Beech Grove campus, and Makalynn spent seventy-five days in the South Campus's Neonatal Intensive Care Unit. Neither Dewayne nor Maleta ever signed a consent form for any of the treatment rendered during their daughter's extended hospital stay.

In late 1999 and again in early 2000, the Schmidts received invoices from St. Francis for services rendered to Makalynn in the amount of $171,816.99. The Schmidts refused to pay the bill, and the hospital, through Mutual Hospital Services, filed a lawsuit in early 2002. The Schmidts represented themselves in the trial court proceedings.

---

1. Maleta was apparently unconscious at this time.

2. Pre-eclampsia is "a condition involving high blood pressure, swelling due to fluid retention, and abnormal kidney function." *Pregnancy Today Glossary of Pregnancy and Labor Terms,* found at *http://pregnancytoday.com/reference/library/glossary.htm* (last viewed June 1, 2005).

In early 2004, Mutual Hospital Services filed a motion for summary judgment. At the summary judgment hearing, counsel for Mutual Hospital Services conceded that consent was never given to the hospital to provide medical services to either Maleta or Makalynn. Tr. at 6, 9. Counsel also acknowledged that the bill included only the cost of Makalynn's care. Tr. at 18. The trial court subsequently entered an order granting Mutual Hospital Service's motion for summary judgment, which reads, in pertinent part, as follows:

> ... The Court, having considered the argument ..., having taken the matter under advisement, and being otherwise duly advised, now FINDS, CONCLUDES and ORDERS as follows:
>
> \*     \*     \*     \*     \*     \*
>
> 4. The parties agree that no consent was given for the hospital to administer medical treatment to Maleta Schmidt or to the baby, Makalyn [sic] Schmidt.
> 5. The Hospital moves for Summary Judgment in its case against the Schmidts for the costs of treatment for Makalyn [sic].
> 6. Maleta Schmidt's medical expenses are not at issue. There is some indication that the hospital "wrote off" those expenses.
> 7. A person has a constitutionally protected liberty interest in refusing unwanted medical treatment. *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 [ (1990) ].
> 8. A parent, however, may not refuse medical treatment for their child to the detriment of that child. "The state's interest in the safety and well-being of minors may compel medical treatment for a child despite objections by the parents that are based upon their religious beliefs." *Mercy Hosp. v. Jackson,* 62 Md.App. 409, 489 A.2d 1130 (1985) and, less delicately stated, "[P]arents may throw their own lives away, if they wish, but they cannot make martyrs of their children." *In the Matter of Application of Long Island Jewish Med. Ctr.,* 147 Misc.2d 724, 557 N.Y.S.2d 239 (1990) *citing Fosmire v. Nicoleau,* 75 N.Y.2d 218, 551 N.Y.S.2d 876, 551 N.E.2d 77 (1990).
> 9. The Schmidts must pay for the medical services provided to their daughter because "A parent has a duty to provide support for his or her minor child, which includes the provision of reasonable and necessary medical services for that child." *Scott Co. School District 1 v. Asher,* 263 Ind. 47, 324 N.E.2d 496 (1975). The parent is obligated even where the parent refused in advance to pay for such services and they were rendered in spite of the refusal to pay. *St. Mary's Med. Ctr. v. Bromm,* 661 N.E.2d 836 (Ind.Ct. App.1996).
>
> IT IS THEREFORE ORDERED that Summary Judgment for Mutual Hospital Services, Inc. is GRANTED.

Appellant's Appendix at 62–63.[3] The Schmidts now appeal.

### Discussion and Decision

■ The Schmidts contend that the trial court erroneously granted Mutual Hospital Services' motion for summary judgment.[4]

---

**3.** We note that neither party included a copy of this order in their brief, contrary to Appellate Rules 46(A)(10) and 46(B)(3).

**4.** The Schmidts contend that there was a genuine issue of fact as to whether the medical services provided to Makalynn were reasonable and necessary, and they contend that they raised this issue to the trial court. Brief of Appellant at 5–6. However, the pages of the appendix to which the Schmidts direct us

## I. Summary Judgment Standard of Review

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). When determining the propriety of summary judgment, we use the same standard as the trial court. *Caito Foods v. Keyes,* 799 N.E.2d 1200, 1201 (Ind.Ct.App. 2003). We construe all facts and reasonable inferences to be drawn therefrom in favor of the non-movant. *Id.* When there is no genuine issue of material fact and the non-moving party is entitled to judgment as a matter of law, summary judgment is appropriate. *Id.* Where, as here, the material facts are essentially undisputed, our task is to determine whether the trial court properly applied the law to the facts. *Id.*

## II. Indiana Law Regarding Payment for Medical Treatment

■■■ "Parents are responsible for the care and keeping of their children. This serious obligation has long been imposed upon them by our common and statutory law. The doctrine of necessaries long has imposed upon parents the legal obligation and duty to provide support and education for their children." *Bergmann v. State,* 486 N.E.2d 653, 662 (Ind.Ct.App.1985). "[I]t is fundamental that a parent owes a duty of providing medical care for a child." *Collection Bureau of Warrick County, Inc. v. Sweeney,* 434 N.E.2d 143, 144 (Ind.Ct. App.1982).

The trial court noted the above principle, and cited two Indiana cases to support its determination that the Schmidts were obligated as a matter of law to pay Makalynn's medical expenses: *Scott County School Dist. 1 v. Asher,* 263 Ind. 47, 324 N.E.2d 496 (1975), and *St. Mary's Med. Ctr. v. Bromm,* 661 N.E.2d 836 (Ind.Ct. App.1996), *trans. denied.* Appellant's Appendix at 63. The Schmidts contend that these cases are distinguishable from this case and that the trial court erred in relying on them.

The plaintiff in *Asher,* an unemancipated sixteen-year-old, was injured while using a bench saw in a high school class. The plaintiff sued the school to recover reasonable medical expenses incurred as a result of his injury, alleging negligence by the school. He was awarded $95,000 by a jury. The school appealed, arguing that an unemancipated minor cannot recover his own medical expenses. The court noted that although in general the contracts of an unemancipated minor are voidable by him, if he contracts for necessaries, he must pay a reasonable price; however, if the minor is living at home or is being supported by his parents, the minor or his parent is only liable on a contract for necessaries if the creditor can prove the parent was failing to provide the child with the necessaries. 324 N.E.2d at 498. "The necessity for medical services is seldom disputed." *Id.* at 499. Because the child received the service and it was necessary, he is liable for the expense. Moreover, the parent is also liable because of his common law duty to support and maintain his child, including the duty to provide necessary medical care. *Id.* Because both parent

do not support their contention. The cited pages contain only statements as to the Schmidts' religious beliefs and the fact that, as stated in their brief, "medical care [is] unnecessary and unreasonable in their lives." *Id.* at 6. This is not the same as raising the issue of whether medical services themselves were reasonable and necessary. Because the

Schmidts did not present this alleged issue of fact to the trial court, we will not review it herein. *See Poulard v. Lauth,* 793 N.E.2d 1120, 1123 (Ind.Ct.App.2003) ("[M]atters not designated as genuine issues of material fact [before the trial court] cannot be relied upon on appeal.").

and child would be liable for the expenses, either may be compensated for them by a tortfeasor. *Id.*

In *Bromm,* a sixteen-year old girl became pregnant and received prenatal and childbirth services from St. Mary's in the amount of $16,079.93. St. Mary's sought payment from the girl and her divorced parents, and ultimately filed a collection action against all three. St. Mary's filed a motion for partial summary judgment regarding the non-custodial father's liability for the unpaid account. The father filed a cross-motion for summary judgment on the basis that he did not consent to be responsible for his daughter's medical expenses and should not therefore be held liable for them. He noted that he specifically told his daughter and ex-wife that he would not be responsible for any bills should the daughter become pregnant. The trial court denied St. Mary's motion and granted the father's. On appeal, we held that the father's lack of consent and express renouncement of responsibility did not relieve him of the obligation to pay for medical services provided to his child. *Id.* at 838. We therefore reversed the trial court.[5]

As the Schmidts contend, there are significant differences between the cases cited by the trial court and this case. *Asher* is not about a parent's obligation to pay for unwanted medical expenses for a child and thus is not directly on point. It does lay out several fundamental principles regarding parents' obligations to their children, however. In *Bromm,* the father told his daughter and his ex-wife that he would not pay any expenses resulting from a pregnancy; whereas in this case, the Schmidts directly told the medical service providers that they would not pay any expenses re-

sulting from treatment. And in *Bromm,* presumably the medical treatment was requested and consented to; whereas here, not only did the Schmidts not request the treatment, but they specifically declined to consent to treatment. Although we recognize these cases are distinguishable, we also note that no other Indiana case is directly on point.

### III. Religious Objection v. Parental Obligation

The Schmidts contend that because they clearly and repeatedly told emergency personnel and hospital staff of their religious objections to medical treatment and that they would not pay for the services being provided without their consent, the hospital could not have reasonably expected compensation for any services provided and they have no duty to pay. Mutual Hospital Services posits that the Schmidts, as Makalynn's parents, are obligated as a matter of law to pay for the reasonable and necessary medical expenses of their child, and their religious objections thereto do not negate that obligation.

■ "The First Amendment, applicable to the states through the Fourteenth Amendment, contains two freedoms with respect to religion: the freedom to believe and the freedom to act. The freedom to believe is absolute, while the freedom to act is subject to regulation for the protection of society." *Konkle v. Henson,* 672 N.E.2d 450, 454 (Ind.Ct.App.1996) (citing *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). The United States Supreme Court has recognized that in matters involving the free exercise of religious beliefs, parents, while free to make martyrs of themselves, are not free under identical circumstances to make martyrs of their children before the

---

5. We noted, however, that the father was not obligated to pay any medical expenses which resulted from services provided to his daughter's child, and remanded for the trial court to

determine which expenses were attributable to the daughter alone and enter summary judgment for St. Mary's in that amount. *Id.*

children have reached the age of full and legal discretion when they can make choices for themselves. *Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (although *Prince* did not concern the provision of medical treatment, the court did note that "neither rights of religion nor rights of parenthood are beyond limitation.... The right to practice religion freedly [sic] does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death." *Id.* at 166–67, 64 S.Ct. 438). Thus, although an adult generally cannot be forced to undergo medical treatment against his religious principles,[6] a parent's decision to refuse lifesaving medical treatment for a minor child must yield to the State's interest in protecting the health and welfare of the child.

■ The initial treatment provided to Makalynn was emergency in nature, and because she was born in the hospital with potentially life-threatening ailments, the hospital had a continuing duty to treat her, notwithstanding the circumstances surrounding her birth and admission. Even though the Schmidts did not request the treatment, and in fact specifically declined the treatment, they are nonetheless responsible for the cost thereof. In *Biggerstaff v. Vanderburgh Humane Soc'y, Inc.*, 453 N.E.2d 363, 364 (Ind.Ct.App.1983), we

noted that even when benefits are conferred by one upon another officiously, if they are conferred "under circumstances making such action necessary for the protection of interests of the other or a third person, restitution will not be denied in the absence of a request." Typical circumstances under which restitution has been ordered absent a showing the benefits were requested include emergency situations. *Id.* at 364 n. 3. This is especially true in a medical emergency situation because parents do not have the right to refuse life-saving treatment and therefore the hospital had to act and had to act immediately. The Schmidts are therefore responsible for the expenses of the medical treatment provided to Makalynn in the emergency situation.

■ After the initial emergency had passed, it would have been appropriate for the hospital to seek the State's intervention in determining a further course of action for Makalynn's care. "A parent has a fundamental right to direct the upbringing of his or her child; moreover, there exists a corresponding duty of the parent to provide for the child's physical and mental well-being. Where the parents fail to fulfill their duty, the state has the authority, pursuant to its *parens patriae* power, to intervene." *Lake County Div. of Family and Children Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind.Ct.App.1994).[7] For

---

**6.** We note that, in apparent recognition of this principle, the hospital is seeking payment only for those services provided to Makalynn, and is seeking no compensation for the services provided to Maleta.

**7.** The State's authority to intervene is based upon statutes permitting a court to declare that a child is neglected. *See* Ind.Code § 31–34–1–1 ("A child is a child in need of services if before the child becomes eighteen (18) years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or

custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that the child: (A) is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court."). We also note that the Schmidts can find no respite in Indiana Code section 31–34–1–14, which provides, "If a parent, guardian, or custodian fails to provide specific medical treatment for a child because of the legitimate and genuine practice of the religious beliefs of the parent, guardian, or custodian, a rebuttable presumption arises that the child is not a child in need

reasons unknown from the record, the hospital did not seek the intervention of the State on Makalynn's behalf, but continued to treat Makalynn over her parents' objections and even, at some point, stopped asking the Schmidts for consent and simply provided the treatment on its own initiative. We acknowledge that the hospital was probably acting in what it considered to be Makalynn's best interests; however, it is only the State that has the authority to usurp the parents' rights in determining a child's best interests, and we do not condone this course of action by the hospital. However, if the Schmidts believed that the hospital's care of Makalynn continued past her medical endangerment and that the hospital was infringing upon their rights to make decisions for their child, they had an obligation to seek the State's intervention themselves, by filing a complaint for injunction or some other applicable action. The Schmidts' failure to take action to demand Makalynn's release after the initial emergency attendant to her birth had passed operates as a tacit agreement that the hospital give care to her and that the hospital be paid for its services. We acknowledge the Schmidts' forthrightness about their religious beliefs and our holding is not intended to cast any reflection upon those beliefs, as it is clear that despite their unwillingness to seek medical assistance, the Schmidts wanted their child to live. However, to hold otherwise would make it all too easy for parents to avoid legitimate obligations by declaring that they did not request and did not want necessary medical care for their children at the point at which the hospital had no choice but to provide the care.

We therefore agree with Mutual Hospital Services and the trial court that the Schmidts' religious objections to medical treatment and their attempts thereby to disclaim any obligation to pay for the treatment do not negate their parental obligation to provide necessary medical care for their child or the corresponding duty to pay for the services.[8] We hold, as a matter of law, that the Schmidts are responsible for the costs of the medical services provided to Makalynn. The trial court therefore properly granted summary judgment to Mutual Hospital Services on its complaint.

## Conclusion

The Schmidts have an obligation as a matter of law to pay for the medical services provided to their daughter even over their objection, and the trial court therefore properly granted summary judgment to Mutual Hospital Services on its com-

---

of services because of the failure." This is so because the statute also provides that the presumption does not apply "to situations in which the life or health of a child is in serious danger." Ind.Code § 31–34–1–14(2).

8. We do not disagree with Judge Bailey's opinion concurring in result that the Schmidts are obligated to pay by virtue of the doctrine of necessaries. However, where Judge Bailey phrases the question as whether "faith and prayer constituted 'suitable provision' for [Makalynn's] medical needs," op. at 985, we would first determine whether the services were in fact necessary. A parent does have a right—unless and until the State

intervenes—to make medical decisions for his or her child, including the right to refuse treatment except in life-threatening situations. Judge Bailey posits that Makalynn was in a life-threatening situation throughout her stay at the hospital. Whether or not the emergency situation persisted or abated, the result in this case is the same: for as long as the medical emergency existed, the parents had no right to refuse treatment and must pay for the services provided. If the emergency subsided, the parents did have a right to refuse further treatment, but failed to secure their right to do so knowing that the hospital would continue providing treatment, and therefore must pay for the services.

plaint for payment of amounts owed. The trial court is affirmed.

Affirmed.

CRONE, J. concurs.

BAILEY, J., concurs in result with separate opinion.

BAILEY, Judge, concurring in result.

I concur in the majority's conclusion that the Schmidts are responsible for the expenses associated with M.S.'s medical care, which were necessary and reasonable.[9] I write separately, however, because I disagree with several aspects of the majority's analysis.

In particular, while I agree with the majority that the Schmidts are responsible for the expenses of M.S.'s medical care provided in the "initial" emergency situation, I disagree that the emergency situation came to an end prior to M.S.'s release, such that the hospital should not have continued treating M.S. in the absence of parental consent or State intervention, pursuant to its *parens patriae* power. There is no evidence in the designated materials demonstrating that the emergency situation—which first presented itself on September 8, 1999—*passed* prior to M.S.'s release from the hospital.

To the contrary, the evidence reveals that, when Mrs. Schmidt—who was, at the time, approximately seven months pregnant—arrived at the hospital, she suffered from a condition known as pre-eclampsia, which required an immediate Caesarian section. In an affidavit, Doctor Tessa M. Asdell asserted that, without such treatment, "both patient and child would not have survived." Appellants' App. at 20. As a result of the Caesarian section, M.S. was born premature, at only thirty-one weeks of gestation, and was cared for in the Neonatal Intensive Care Unit. There, M.S. was apparently given blood transfusions and was treated for Hydrocephalous. *See* Appellants' App. at 27. Thus, the medical emergency, with respect to M.S., began in utero and persisted throughout her stay at the hospital.

Moreover, under the present circumstances, I take issue with the majority's conclusion that the hospital should have sought State intervention, via a CHINS or similar proceeding, before it continued to treat M.S., and that, by failing to do so, the hospital usurped the parents' right to determine M.S.'s best interests. Requiring State intervention in a situation where parents are continuing to refuse necessary medical treatment on behalf of their premature and ailing child, in my view, would only delay necessary, life-saving medical treatment to the child. Here, I would commend, rather than admonish, the hospital for its provision of the necessary medical services to M.S., especially in light of the hospital's knowledge that M.S.'s parents were refusing to pay for her care.[10]

Instead, I would have noted that, under the doctrine of necessaries—which imposes a legal obligation and duty on parents to provide support, including necessary medical expenses, for their children—the law may imply a promise by a parent to pay for necessaries furnished to his or her minor child. *Bryant v. Mutual Hosp.*

---

9. *See* op. at 979 n. 4.

10. Indeed, because the hospital rendered medical services to Mrs. Schmidt under circumstances making such treatment necessary to preserve her life, Mutual Hospital Services could have also sought reimbursement for such medical expenses under the doctrine of quantum meruit. For this reason, I also disagree with the majority's inclusion of footnote 6 and would, further, note that Mrs. Schmidt did not refuse medical treatment on behalf of herself when she arrived at the hospital, as she was unconscious. Instead, Mr. Schmidt refused such treatment on her behalf.

*Serv.,* 669 N.E.2d 427, 429 (Ind.Ct.App. 1996). The policy behind this law is to encourage a neglectful parent to assume responsibility for the welfare of the child. *Id.* However, where a parent is ready and willing to make suitable provision for the child, he or she will not be liable for necessaries furnished by others without his or her consent. *Id.*

In the present case, the undisputed evidence reveals that the Schmidts' refusal to give consent to the hospital for the provision of medical services to M.S. resulted from their religious beliefs, which required treatment by spiritual means through faith and prayer. Thus, the question becomes whether faith and prayer constituted "suitable provision" for the child's medical needs. The evidence demonstrates that, when Mrs. Schmidt arrived at the hospital, she required an immediate Caesarian section, without which, "it is highly likely that both patient and child would not have survived." Appellants' App. at 20. As a result of the Caesarian section, M.S. was born premature and required medical care in the Neonatal Intensive Care Unit. Under these circumstances, and in a time when we have an established regimen for treatment of the medical conditions that afflicted Mrs. Schmidt and M.S., I believe that emergency medical care, in conjunction with faith and prayer, were the provisions necessary for the physical welfare of M.S.

It has been said that God sometimes works in mysterious ways. If that is true, it is possible that the "anonymous" 9–1–1 telephone call, which alerted EMS personnel to the impending danger, was in fact the divine intervention for which Mr. Schmidt had prayed. After all, it was only the means and not the result to which Mr. Schmidt objected.

For these reasons, I concur in result with the majority opinion.