Myetta LIPSCOMB and Wayne Lipscomb, her husband, Appellees,

v.

The MEMORIAL HOSPITAL, a corporation, Defendant,

and

Frederick W. Miltenberger, M.D., Appellant.

No. 82–2025.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1984.

Decided May 2, 1984.

Judith Catterton, Rockville, Md. (William A. Ehrmantraut, Rockville, Md., on brief), for appellant.

Rebecca A. Baitty, Charleston, W.Va. (F. Rodney Jackson, Di Trapano & Jackson, Charleston, W.Va., on brief), for appellees.

Before ERVIN and CHAPMAN, Circuit Judges, and BRYAN,* Senior Circuit Judge.

CHAPMAN, Circuit Judge:

The appellant, a surgeon, appeals the jury verdict in this diversity action. The jury found that Dr. Miltenberger had repaired the hiatal hernia of Mrs. Lipscomb without her informed consent while she was under anesthesia for gall bladder surgery. Appellant claims errors by the district court in (a) failing to consider this as a consent (rather than an informed consent) action for battery and apply the one year statute of limitation of Maryland, Maryland Annotated Code, Courts and Judicial Proceedings Article, Section 5–105; (b) failing to find that there was informed consent; (c) that an emergency existed which excused any lack of informed consent; (d) failing to require the plaintiff to prove lack of informed consent by expert testimony; (e) failing to give proper weight to the decision of a Maryland Health Claims Arbitration Panel, which had denied plaintiff's claims; and (f) that there was no causal connection between an alleged lack of informed consent and plaintiff's claimed injuries.

Finding no merit in any of these exceptions, we affirm.

I

Myetta Lipscomb was 51 years of age at the time of trial in June 1982. In 1964 she had hiatal hernia repair surgery from Dr. Calvin Hadidian. In 1968 she became a patient of Dr. Miltenberger and over the next nine years she was subject to a number of surgical procedures performed by Dr. Miltenberger including two hernia operations.

In February 1977 Mrs. Lipscomb entered The Memorial Hospital as a patient of Dr. Miltenberger for the removal of her gall bladder. Immediately prior to this hospitalization the plaintiff and the defendant had discussed the possibility of combining the gall bladder surgery with surgical repair of a hiatal hernia which had also been causing problems to the plaintiff. She had been suffering from a burning sensation in the esophagus, some difficulty in swallowing, regurgitation, and other problems. The existence of a new hiatal hernia was confirmed by x-ray.

There is considerable conflict in the record as to the type of hiatal hernia suffered by the plaintiff at the time of the surgery. Basically, there are two types of hiatal hernias. One is the paraesophageal hiatal hernia in which the gastroesophageal junction stays in place in the abdomen, below the diaphragm, but part of the stomach floats up into the chest cavity. This is a life threatening condition, because it may be complicated by tissue strangulation, bleeding, perforation of the stomach, or obstruction. Treatment for a paraesophageal hiatal hernia is almost always surgical.

A sliding hiatal hernia is when the stomach and the gastroesophageal function

---

* This opinion was prepared prior to the death of Judge Bryan.

slide up and down from the abdomen to the chest through the opening in the diaphragm. This type of hernia is usually not life threatening because the opening is large enough to permit the passage of the stomach and it does not become trapped or twisted. A sliding hiatal hernia is sometimes complicated by food coming from the stomach into the esophagus causing inflammation. Sliding hiatal hernias are usually treated nonsurgically by antacids, elevating the head and chest while sleeping, and other conservative measures. Dr. Miltenberger testified that plaintiff's hiatal hernia was a combination; that is, it was paraesophageal and it slid back and forth through the diaphragm.

When plaintiff was admitted to the hospital, the admitting nurse's notes indicate that she would have surgery for both the gall bladder and the hiatal hernia. The surgery was scheduled for February 22, 1977 and on the evening of February 21 Dr. Miltenberger came by the plaintiff's room for a final check. There is some conflict in the testimony as to all that was said at this meeting involving Mr. and Mrs. Lipscomb and the doctor, but it is undisputed that Dr. Miltenberger said he would only do the gall bladder surgery, because he thought her symptoms would improve after removal of the offending gall bladder.

On the evening of February 21, 1977 Mrs. Lipscomb signed a surgical consent form authorizing gall bladder surgery. This form contained the following sentence:

I further consent to the performance of any additional surgery, treatment, x-rays or procedures during the course of the procedure described which the physician, or his associates, judge necessary or desirable to correct the existing condition or any unhealthy condition which they may discover.

Mrs. Lipscomb testified that she had read and signed the form and that she was familiar with its contents since she had signed similar surgical consent forms when facing surgery in the past.

During the gall bladder surgery, Dr. Miltenberger found the hiatal hernia to be much larger than he had expected. He testified that the opening between the chest and the abdomen was of sufficient size to admit all of the fingers on one of his hands. Without consulting with Mr. Lipscomb or bringing Mrs. Lipscomb out from under the general anesthesia to secure her consent, the doctor proceeded to surgically repair the hiatal hernia by doing a Nissen fundoplication, which involves wrapping the stomach around the esophagus. Immediately following surgery he advised the plaintiffs of the extent of the surgery and the necessity for correcting the hiatal hernia.

Mrs. Lipscomb had a difficult convalescence following this surgery. She experienced severe difficulty in swallowing, had trouble retaining anything she had eaten, lost 40 to 50 pounds, and complained of constant pain. She returned to the doctor with her complaints and an x-ray was done. The x-ray reported that her lumen (opening in the esophagus) was only half as large as normal, but Dr. Miltenberger did not agree with the x-ray report and prescribed no further treatment.

In May 1977 plaintiff went to visit her sister in Elkin, West Virginia and consulted a physician there and had surgery to enlarge her esophagus. This surgery produced some relief, but she was still required to undergo dialation of her esophagus every two weeks.

Expert testimony showed that difficulty in swallowing, due to wrapping the stomach too tightly around the esophagus, is the most common complication following a fundoplication. Dr. Miltenberger testified that it occurred in at least sixty percent of the cases.

In the summer of 1979 Mrs. Lipscomb filed a claim for damages against Dr. Miltenberger with the Maryland Health Claims Arbitration Office. One of the grounds of this claim was that the defendant did hernia surgery without plaintiff's informed consent. After the hearing panel denied plaintiff's claim, the present action was commenced.

## II

■ In this diversity action the district court ruled that under Maryland law the case presented a claim grounded upon lack of informed consent rather than lack of consent, and that under *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977) "[a] cause of action under the informed consent doctrine is properly cast as a tort action for negligence as opposed to battery or assault." n. 4 at 1020 (citations omitted). As a negligence action, this case would be subject to a three year statute of limitation, Maryland Annotated Code, Courts and Judicial Proceedings Article, Section 5–101, but as an action for battery, it would be untimely under a one year statute, Maryland Annotated Code, Courts and Judicial Proceedings Article, Section 5–105.

Dr. Miltenberger argues that even though he and Mrs. Lipscomb had discussed doing the hiatal hernia repair at the same time as the gall bladder surgery, it was agreed on the evening of February 21, 1977 that only the gall bladder removal would be done the following day, therefore he contends there was no consent of any kind to the additional hernia repair, and without such consent the operation was a battery. This argument overlooks the consent form, which authorized the gall bladder removal and contained the language consenting to any additional surgery the surgeon or his associates may "judge necessary or desirable to correct the existing condition or any other unhealthy condition which they may discover."

Finding that this language was a type of consent and the hiatal hernia repair was not an unconsented-to assault, the district judge ruled that the Maryland law of informed consent applied. Although there are no Maryland cases directly on point, we are persuaded by the reasoning of the district judge on this point. Because this is an informed consent case, it is not barred by the one year statute of limitation and is timely filed under the three year statute.

## III

Appellant argues that if the district court is correct in applying the law of informed consent, the record conclusively shows that Mrs. Lipscomb sufficiently consented to the hernia repair. First, he contends that the consent form was sufficient because it allowed additional surgery as judged necessary by the surgeon. Second, Miltenberger argues that plaintiff knew of the procedures and the risks involved because plaintiff and defendant had discussed correcting the hiatal hernia, plaintiff had undergone a hiatal hernia operation in 1964 and Dr. Miltenberger had previously performed two inguinal hernia repairs for plaintiff. In support of this argument appellant cites *Vergie M. Lapelosa, Inc. v. Cruze*, 44 Md. App. 202, 407 A.2d 786 (1979), which held that if risks are known to a patient, the doctor is under no duty to inform her of those risks.

■ Appellant's first argument fails because as emphasized in *Sard v. Hardy, supra*, the consent form signed by Mrs. Lipscomb is effectual only if it represents her informed consent. "Unless a person has been adequately apprised of the material risks and therapeutic alternatives incident to a proposed treatment, any consent given, be it oral or written, is necessarily ineffectual." *Id.*, 379 A.2d at 1019, n. 3.

We are also not persuaded by appellant's second argument. The evidence does not support appellant's contention that Mrs. Lipscomb was already aware of the risks involved in the Nissen fundoplication appellant performed on her. Mrs. Lipscomb testified that prior to the 1964 surgery she was informed only that the surgery "was a dangerous procedure" and that she "didn't have a chance at all if she didn't have it." The 1964 surgery was to repair a paraesophageal hernia using the Allison procedure, while the 1977 surgery was to correct a sliding hiatal hernia, or a combination sliding and paraesophageal hernia, using the Nissen procedure. Also, Dr. Miltenberger admitted that surgical procedure for correction of hiatal hernias had changed between 1964 and 1977, that certain procedures done in the past were no longer used, and that medical literature on the subject

was constantly changing. In addition, the *Cruze* case on which appellant relies is distinguishable in that it involved only a dye study and not major surgery.

In discussing a surgeon's duty to inform a patient prior to an operation, the court in *Sard, supra,* stated:

This duty to disclose is said to require a physician to reveal to his patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment.

\* \* \* \* \* \*

Once the physician has ascertained the risks and alternatives, and has communicated this information to the patient, it is the patient's exclusive right to weigh these risks together with his individual subjective fears and hopes and to determine whether or not to place his body in the hands of the surgeon or physician. No question requiring the exercise of medical judgment ever arises at this stage of the decision-making process.

\* \* \* \* \* \*

We think, then, that the proper test for measuring the physician's duty to disclose risk information is whether such data will be material to the patient's decision:

"The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever is material to the decision. Thus, the test for determining whether a potential peril must be divulged is its materiality to the patient's decision." *Cobbs v. Grant,* [8 Cal.3d 229] 104 Cal.Rptr. [505] at 515, 502 P.2d [1] at 11 [1972].

By focusing on the patient's need to obtain information pertinent to the proposed surgery or therapy, the materiality test promotes the paramount purpose of the informed consent doctrine—to vindicate the patient's right to determine what shall be done with his own body and when.

We hold, therefore, that the scope of the physician's duty to inform is to be measured by the materiality of the information to the decision of the patent. A material risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure.

*Sard, supra* 379 A.2d at 1020–1022.

The trial judge charged this law of informed consent to the jury. There was evidence that Mrs. Lipscomb was not aware of the risks and dangers of the surgery, the probability of difficulty in swallowing following a Nissen fundoplication, and the fact that a large percentage of sliding hiatal hernias are successfully treated with antacid tablets and other conservative measures short of surgery. The jury verdict indicates that the jurors felt that this type information was necessary for a reasonable person to make an intelligent decision as to whether to submit to the surgical procedure.

## IV

The surgeon claims that when he found an opening in the diaphragm large enough to receive his entire hand, he was faced with an emergency and he could proceed to correct the condition without consent. He argues that the scope of the duty to disclose and inform is an issue only after it has been established that a duty to disclose exists, and since an emergency situation is an exception, the duty to disclose never arose under the facts in this case.

Appellant concedes that the law of emergency was charged to the jury. The charge was favorable to the defendant. The trial judge informed the jury that it must find for the defendant if "an emergency situation existed whereby it was impractical to obtain the plaintiff's consent." The source of much of the medical law contained in the charge is *Sard v. Hardy,* which at page 1022 states:

Likewise, the physician's duty to disclose is suspended where an emergency of such gravity and urgency exists that it is impractical to obtain the patient's consent.

The plaintiff's medical expert testified that discovery of a larger than expected sliding hiatal hernia did not represent an emergency and that such a condition was not life threatening. He also testified that since the hiatal hernia was known to exist prior to the surgery, as was the possibility that it might need correcting, this contingency should have been fully disclosed and discussed with the patient and permission obtained. The failure to obtain consent under such circumstances was a deviation from accepted practice according to the plaintiff's expert.

The claim of emergency created a factual issue for the jury. Since the jury has resolved this issue in favor of the plaintiff, we may not disturb it.

### V

■ Again using *Sard* as a reference, the district judge charged the jury:

> Now, in order to sustain the burden of proof, Plaintiff must produce expert testimony as to the following factors under Maryland law: First, the nature of the risk inherent to the operation of February 22, 1977, and the operation is a hiatal hernia repair. Second, the probability of the therapeutic success of the operation of February 22nd. Third, the frequency of occurrence of the particular risks involved in the operation of February 22nd. And fourth, the nature of the available alternatives to the operation, including the respective failure rates for such alternative procedures, and the risks of harm inherent in the alternative procedures.

Defendant argues that plaintiffs produced expert testimony only as to the first and fourth elements and did not present expert testimony as to the probabilities of therapeutic success and the frequency of the occurrence of the particular risk.

Dr. Miltenberger was called as a witness by the plaintiff and testified that the most common risk of a Nissen fundoplication is difficulty in swallowing. Other risks include inability to belch or vomit, rupture of the spleen, failure of the operation to correct the problem, slippage of the repair along the middle of the stomach creating obstruction, disruption of sutures on the repair to the point that the repair is nonfunctional, infection, phlebitis, pulmonary embolism, and, with Mrs. Lipscomb, possible coronary artery disease and pulmonary disease, because she had had prior problems with her heart and lungs.

As to the frequency of occurrence of a particular risk, Dr. Miltenberger testified that although difficulty in swallowing occurred in every case with a Nissen fundoplication, usually within six weeks to six months it became less a problem. He also testified that some people continued to have the problem indefinitely.

He stated that this problem with swallowing was usually caused by wrapping the stomach too tightly around the esophagus and there was always the possibility of a surgeon accidentally putting a suture through the lumen. The evidence showed that Mrs. Lipscomb had a stitch through her lumen, as found on examination sometime after the February 22, 1977 operation, but there was a dispute as to its origin. Plaintiff has complained of difficulty in swallowing continually since the Nissen fundoplication, which would indicate she suffers from the most common post-operative problem.

Dr. Ward Griffin, plaintiff's expert, testified as to the risks inherent in the operation and the probability that such an operation might be unsuccessful. The testimony of Drs. Miltenberger and Griffin when read together is sufficient to satisfy the four elements requiring expert testimony under *Sard v. Hardy*.

### VI

■ Section 3–2A–06(d) of the Annotated Code of Maryland, Courts and Judicial Proceedings Article provides that the arbitra-

tion award made by the arbitration panel in a medical malpractice claim is admissible as evidence in the trial court should the panel's decision be rejected, and "the award shall be presumed to be correct, and the burden is on the party rejecting it to prove that it is not correct."

Appellant contends that the district court committed error in failing to charge the jury correctly as to the weight to be given the arbitration panel's determination that Dr. Miltenberger was not liable to the Lipscombs. On this point the judge instructed the jury:

You are further instructed that a Maryland statute instructed [sic] that a medical malpractice claim be submitted to arbitration before a matter may come before this Court. Either party may appeal the arbitrator's decision, and if such an appeal is taken, the matter is tried all over again here in this case. The claim in this case was submitted to arbitration and it was decided that the Defendant, Miltenberger, was not liable, and Mr. and Mrs. Lipscomb are before you now on what amounts to an appeal from that decision. You are not bound by the decision of the arbitration panel, but that decision is to be considered as evidence in the case, and you may give it such weight, if any, as you think it deserves. You are further instructed, however, that the determination of the arbitration panel is presumed to be correct and the Plaintiffs have the burden of proving by a preponderance of the evidence that that decision is wrong. In meeting the burden, the Plaintiff may rely on the same evidence or less evidence or more evidence than what was presented to the Health Claims Arbitration Panel.

Appellant argues that a higher standard of proof than a preponderance of the evidence is required to overcome the presumption of correctness of the panel's award. This argument was expressly rejected in *Attorney General v. Johnson,* 282 Md. 274, 385 A.2d 57 (1978), where the court stated: "When the malpractice claimant is the party appealing, the statutory provision thus has no effect whatever on the burden of proof in respect to the primary negligence." 385 A.2d at 68–69. The judge's charge is a fair presentation and explanation of the Maryland statute.

## VII

■ Appellant's last exception is that there is no causal connection between his alleged failure to obtain informed consent to the hiatal hernia repair and the injuries suffered by Mrs. Lipscomb therefrom. He asserts that the two step analysis of *Sard* has not been met. It requires:

1. That the plaintiff must identify an undisclosed risk which would have altered her decision to undergo the treatment had it been disclosed;

2. That plaintiff must show that the particular risk materialized and caused injuries for which she seeks recovery.

The defendant's own testimony provides the causal connection. He testified that difficulty in swallowing occurs in almost every case for a period of six weeks to six months and lasts indefinitely in many cases. Mrs. Lipscomb was not advised of this risk and her testimony and the testimony of the defendant show that the risk materialized and caused her pain, loss of weight, nausea and other complications and discomfort that would be considered elements of damage in a medical malpractice case.

AFFIRMED.

ALBERT V. BRYAN, Senior Circuit Judge, dissenting:

Dr. Miltenberger is now held liable in damages for repairing a hiatal hernia of Myetta Lipscomb, which he discovered in operating upon her for removal of the gall bladder. The discovery convinced him on sight that without repair at once, the hernia was an immediately impending threat to her life. With the open abdominal incision revealing the gall bladder as well as the hernia, with his patient unconscious and with no assistance at hand, he faced an emergency demanding action forthwith to

save the plaintiff's life and he so *acted.* I dissent from the conclusion of this Court's majority that his informed and responsive determination subjected him to tort or contract liability at law to the one whose life he saved.