550 A.2d 717

Helen NASH

v.

Anthony J. RANERI, et al.

No. 471, Sept. Term, 1988.

Court of Special Appeals of Maryland.

Dec. 5, 1988.

William J. Blondell, Jr. (David B. Ginsburg and William J. Blondell, Jr., Chartered on the brief), Baltimore, for appellant.

Catherine A. Potthast (John G. Prendergast, Jr. and Smith, Somerville & Case, on the brief), Baltimore, for appellees.

Argued before MOYLAN, WILNER and ROBERT M. BELL, JJ.

MOYLAN, Judge.

The appellant, Helen Nash, required the amputation of her left leg following complications from bypass surgery. Mrs. Nash filed a medical malpractice claim with the Health Claims Arbitration Office against the appellees, Dr. Anthony J. Raneri and Neil Novin Surgical Associates, P.A. The Health Claims Arbitration Panel awarded Mrs. Nash $220,-000. The parties thereafter filed actions to nullify the award and litigate the claim in the Circuit Court for Baltimore City. The case was tried before a jury. The jury returned a verdict in favor of the appellees, and judgment was entered accordingly. Mrs. Nash has filed this appeal.

The appellee Dr. Raneri is a vascular surgeon and is a partner with Dr. Neil Novin in the appellee professional association known as Neil Novin Surgical Associates, P.A. Mrs. Nash first saw Dr. Raneri on September 9, 1980. For several years, she had been experiencing leg pain while walking. The pain was more pronounced in the right leg, although she experienced the pain in the hips and calves of both legs. The pain had worsened over the years. Shortly before September, 1980, the leg pain was so severe that Mrs. Nash had to stop and rest at least five minutes after walking only a block or so. Her cardiologist, Dr. Lawrence Awalt, diagnosed her condition as "intermittent claudication," caused by the build-up of plaque on the inside walls of the arteries. This condition is also known as atherosclerotic vascular disease or hardening of the arteries. It is caused by a deposition of cholesterol-type fat in the walls of the arteries over a period of time. The plaque build-up in the arteries restricted blood flow to Mrs. Nash's legs, thereby depriving her muscles of oxygen and nutrients and causing the discomfort that she was experiencing. Dr. Awalt referred Mrs. Nash to Dr. Raneri.

Dr. Raneri's examination of Mrs. Nash confirmed blockage in the arteries of both legs. He recommended that she be hospitalized for an arteriogram to define the areas of

occlusion or stenosis. Mrs. Nash underwent an arteriogram at South Baltimore General Hospital on September 17, 1980. This procedure indicated that she had significant blockage of the arteries in both legs, with more blockage in the right leg.

Dr. Raneri recommended that Mrs. Nash undergo aorto-femoral bypass surgery and discussed the risks of the procedure with her. In Mrs. Nash's case, the blockage was in the aorta and in the iliac arteries. The iliac arteries branch from the aorta into the legs. The femoral arteries are the same blood vessels but are below the iliac arteries. Aorto-femoral bypass surgery involves placing a graft from the aorta, around the diseased iliac artery, to the healthy femoral artery. The blood flow is thereby channeled from the aorta to a point below the blockage. This relieves the symptoms and discomfort of the disease, although it does not cure it.

Dr. Neil Novin, Dr. Raneri's partner, saw Mrs. Nash at the South Baltimore General Hospital after the arteriogram and discussed the proposed surgery with her. He explained to her that the risk of the proposed operation was significant. He told her that she could die from the procedure. She could have significant bleeding or her kidneys could fail. She could develop an infection and she could lose her leg.

On September 18, Mrs. Nash signed a consent form for an aorto-bifemoral bypass—an insertion of a graft from the aorta to the femoral arteries on both sides. The surgery took place the next day. During the course of that surgery, Dr. Raneri, however, decided to perform a bilateral aorto-iliac bypass instead of a bilateral aorto-femoral bypass. This involves attaching the lower portion of the graft to the iliac arteries nearer the aorta rather than to the femoral arteries further down. In the process, a phenomenon known as an "embolic shower" occurred. Small sand-like particles of plaque broke loose from the diseased blood vessels and traveled to the tiny peripheral blood vessels of Mrs. Nash's left foot and leg. This caused a severe circulatory obstruc-

tion or "trash foot." Gangrene set in, which eventually required the amputation of Mrs. Nash's left leg below the knee.

At the trial, at the conclusion of all of the evidence, Mrs. Nash made a motion for judgment on the issue of informed consent. The court denied the motion. The jury was instructed on the law of informed consent. It returned a special verdict finding that Mrs. Nash had given informed consent for the procedure and that there was no violation of the standard of care by the appellees. On this appeal, Mrs. Nash contends that she was entitled to a judgment as a matter of law on the issue of informed consent. She contends that Dr. Raneri performed a different surgical procedure than was discussed with her and failed to discuss alternatives to, or risks of, surgery.

The doctrine of informed consent was thoroughly discussed by the Court of Appeals in *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977). The doctrine follows logically from the requirement that a physician, treating a mentally competent adult under a non-emergency situation, cannot perform surgery or administer other therapy without the patient's consent. That consent must be an "informed" consent, that is, the physician must "explain the procedure to the patient and ... warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment." 281 Md. at 439, 379 A.2d 1014. With respect to what the physician must disclose to the patient, the Court in *Sard v. Hardy* said, at 281 Md. 440, 379 A.2d 1014:

"This duty to disclose is said to require a physician to reveal to his patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment."

The proper test for measuring what risk information the physician has a duty to disclose is "whether such data will

be material to the patient's decision." 281 Md. at 443, 379 A.2d 1014.

Dr. Raneri discussed the possibility of surgery with Mrs. Nash after he first examined her and confirmed that there was blockage in the arteries of both legs. The blood pressure in Mrs. Nash's right leg compared to the blood pressure in her right arm was only 40 per cent; in her left leg, it was 60 per cent of the pressure in her left arm. This indicated to Dr. Raneri that Mrs. Nash had a severe loss of circulation.

While Mrs. Nash was in Dr. Raneri's office, he called her cardiologist, Dr. Awalt, and discussed her condition with him. Mrs. Nash had been smoking for some 35 to 40 years. She had had two heart attacks. Dr. Awalt had attempted to get her to stop smoking, to no avail. At the time she saw Dr. Raneri, Mrs. Nash was so incapacitated by the disease that she was having trouble working and in doing her housework. She was unable to travel.

Dr. Raneri testified that cessation of smoking and increased exercise, which are the "conservative treatment" for intermittent claudication, would have been ineffective in Mrs. Nash's case to correct the severe problem she had. These measures do not improve the condition but may stabilize it so that a patient does not get worse. Dr. Raneri testified that although he discussed smoking cessation with Mrs. Nash, he felt that her incapacitation "was severe enough to go beyond that." He felt additionally that she had developed the maximum collateral circulation she was going to develop from increased exercise, yet her condition continued to worsen. He, therefore, discussed with her the possibility of surgery to correct her problem. Dr. Raneri told Mrs. Nash that, given her condition, there was a "very high probability" she would lose a limb if she did not have surgery. The defense experts, Dr. Karl Mech and Dr. G. Melville Williams, agreed that the chances of Mrs. Nash's condition improving by doing anything other than surgery were "really negligible."

Under the circumstances, the question of whether Dr. Raneri should have offered and/or did offer Mrs. Nash a course of medical management other than surgery and what bearing this had on the patient's decision to undergo surgery were matters to be resolved by the jury.

■ Mrs. Nash contends additionally that Dr. Raneri failed to discuss with her the surgery he actually performed. She contends that what was discussed with her was an aorto-femoral bypass procedure and that what Dr. Raneri actually performed was an aorto-iliac bypass procedure. She argues that this was a much riskier procedure since the femoral arteries were smooth and healthy and had no evidence of disease whatsoever while the iliac arteries were diffusely diseased with plaque that could easily break off from manipulation. She argues that Dr. Raneri never obtained an "informed consent" to perform an aorto-iliac bypass.

Dr. Raneri explained that he decided to perform a bilateral aorto-iliac bypass instead of a bilateral aorto-femoral bypass because this procedure was less complicated. Mrs. Nash had a history of heart attacks. Anesthesia and surgical time represented significant risks to her. During surgery, Dr. Raneri was able to touch Mrs. Nash's arteries to determine the degree and location of the calcification and, after doing so, felt that her iliac arteries would accept the graft. He, therefore, decided to attach a shorter graft than originally anticipated. Dr. Raneri explained that such a procedure involved "significantly less time" in surgery, less chance of infection, and only one incision into the body. If the graft had been attached to the femoral arteries, two incisions, on each side of the groin area, would have been necessary.

Dr. G. Melville Williams, the Chief of the Department of Vascular Surgery at Johns Hopkins Hospital, testified on behalf of the defense that performing an aorto-bi-iliac procedure when the consent form specifies an aorto-bifemoral procedure complies with the accepted standard of care.

Mrs. Nash relies upon *Lipscomb v. Memorial Hospital,* 733 F.2d 332 (4th Cir.1984), to support her contention that she did not give an informed consent. We find that reliance to be misplaced. In *Lipscomb,* the surgeon discussed with the patient the removal of her gall bladder. During the operation, the surgeon decided to perform a non-life-threatening hiatal hernia repair in addition to the gall bladder surgery. Even under those circumstances, the court did not direct a verdict in favor of the plaintiff on the issue of informed consent. Instead, the issue was submitted to the jury.

The situation in this case is akin to that in *Wachter v. United States,* 689 F.Supp. 1420 (D.Md.1988). In *Wachter,* the United States District Court for the District of Maryland was presented with a medical malpractice claim by a woman who underwent unsuccessful coronary artery bypass graft surgery at a Navy hospital. She sued her doctors, contending that there was "a lack of informed consent due to the Navy physicians' failure to inform the plaintiffs of the possible use of the internal mammary artery (IMA) to supply the grafted vessel, instead of the saphenous vein." *Id.* at 1422. Applying Maryland law, the court there said, at 1423–1424:

"In this Court's opinion, Maryland law does not require that a surgeon inform a patient about, or obtain the patient's consent to, the details or mechanical means of performing an operation. Rather, the purpose of the informed consent requirement is to assure that the patient is informed of alternative treatments, such as surgery versus radiation or chemotherapy, or radical versus less radical resection. Given the indisputable fact in this case that the IMA versus saphenous vein controversy was not settled at the time, the question of which vein to use was simply not one that ought to have been put to the patient, under any possible construction of Maryland law. The use of the IMA instead of the saphenous vein did not constitute, in this Court's opinion, a 'medically significant alternative for care or treatment,' but, rather, merely a question for the surgeon's judgment as to the manner or

means of performing a particular operation, *viz.*, the coronary artery bypass graft. It is inconceivable to this Court that Maryland case law would require, for informed consent, that the surgeon discuss, and obtain consent beforehand as to, the tactical details of the surgery, such as the location of incision, the techniques of surgery, the type of sutures, the source of a graft, or other details of the operation. Such a requirement would be overly burdensome to the physician and would add nothing to the ability of a lay patient to give informed consent to surgery as versus some other medically available procedure. It is to the informed making of that decision, *viz.*, surgery versus other treatment modalities, to which the Patient's Bill of Rights and Maryland cases such as *Sard v. Hardy* are aimed."

The district court concluded that the case presented "only a choice of tactical surgical approaches, rather than a choice among treatment modalities, and, thus, it present[ed] no issue of lack of informed consent." *Id.* at 1424.

In this case, Dr. Raneri made a tactical decision during the course of surgery to attach a shorter graft than originally anticipated. That decision was made after the doctor weighed the respective risks to his patient of attaching the graft to the iliac arteries versus attaching it to the femoral arteries. The procedure was intended to achieve the same result—to bypass the occluded arteries. What happened in the process was an unfortunate consequence of bypass surgery. It was not, however, an occurrence of which we can say as a matter of law that Mrs. Nash was unaware. Both Dr. Raneri and Dr. Novin testified that they informed Mrs. Nash of the risks of bypass surgery. Whether that information was somehow deficient was, at the very least, for the jury to decide. The jury found that Mrs. Nash gave an informed consent to the surgery. There was evidence to support that finding.

■ Mrs. Nash finally contends that the trial judge committed reversible error by refusing to instruct the jury as follows:

"The Rules and Regulations of the South Baltimore General Hospital medical staff provide that whenever a diagnosis is obscure, that is, that the physician is unsure of the nature of a problem, he must seek whatever consultation is necessary to assist him in understanding and treating the problem or complication. Failure to seek such consultation is a violation of the standard of care and is negligence."

We hold that the trial judge was correct in refusing such an instruction. Even assuming that the instruction correctly stated the regulations of the South Baltimore General Hospital, it was for the jury to determine, after weighing all the evidence, whether there was a violation of the standard of care and, if so, whether that violation proximately caused the injury of which Mrs. Nash complained. The requested instruction improperly infringed upon the fact-finding prerogative of the jury by amounting to a directed verdict. *See generally Zeller v. Greater Baltimore Medical Center,* 67 Md.App. 75, 506 A.2d 646 (1986). The instruction given by the trial judge on the standard of care, furthermore, adequately apprised the jury of the law in this regard.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.