**Jean M. WACHTER; Robert Wachter,
Plaintiffs–Appellants,**

v.

**UNITED STATES of America,
Defendant–Appellee.**

**No. 88–3141.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 10, 1989.

Decided June 6, 1989.

Rehearing and Rehearing In Banc
Denied Aug. 23, 1989.

---

Robert T. Hall (Hall, Markle & Sickels, on brief), for plaintiffs-appellants.

Billy S. Bradley, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., Juliet A. Eurich, Asst. U.S. Atty., on brief), for defendant-appellee.

Before ERVIN, Chief Judge, and MURNAGHAN and WILKINSON, Circuit Judges.

ERVIN, Chief Judge:

Jean M. Wachter appeals from an order granting defendant, the United States, summary judgment in Wachter's Federal Tort Claims Act ("FTCA"), 28 U.S.C.A. § 2671 et seq., suit for medical malpractice. The district court found no evidence creating genuine issues that harm had accrued to Wachter from the misrepresentations and failures to disclose that she alleged. We agree, and affirm.

## I.

### A.

Wachter, then fifty-five years old, entered the Bethesda Naval Hospital ("Bethesda") for double coronary artery bypass surgery on March 1, 1983. Wachter's attending surgeon during this hospitalization was Commander Reginald Peniston. Commander Edward L. Woods, Jr., a resident in thoracic surgery, performed Wachter's March 4, 1983, operation under Peniston's direct supervision. Woods used segments of saphenous veins removed from Wachter's leg to bypass occluded portions of the native coronary arteries. Prior to the operation, Woods had apprised Wachter of what the saphenous vein graft procedure ("SVG") involved, what alternative procedures existed, the possible complications and sequelae of SVG [1], and that the decision whether to proceed was ultimately hers. Wachter indicated that she understood what Woods had said and signed an SVG consent form.

By July, 1983, it had become clear that Wachter's SVG had failed. Wachter's symptoms, and the results of a cardiac catheterization, revealed that the grafted veins were between seventy and ninety percent occluded. Bethesda surgeons recommended a second double bypass procedure.

Wachter had begun reading about the heart and bypass surgery while hospitalized after the March operation. After her doctors counseled a second procedure, and with her husband's assistance, Wachter began a concerted campaign of self-education.[2] After investigating alternative techniques and facilities, Wachter satisfied herself that entering Bethesda for a second bypass was her only alternative.

It is on what Bethesda surgeons told her when she submitted herself for the second procedure that Wachter's claims center. Wachter's primary surgeon for the August 1, 1983, operation was Dr. Donal M. Billig. Billig was then Bethesda's chief of cardiothoracic surgery.

Since Wachter's second SVG, the Navy has cashiered Billig based on a number of revelations.[3] One of Wachter's complaints

---

1. Woods specifically indicated the possibilities of post-surgical hemorrhage, myocardial infarction, stroke, death, infection, and occlusion of the grafted veins.

2. Despite her doctor's advice that she remain hospitalized for a prompt second SVG following her cardiac catheterization, Wachter insisted that she be discharged to plumb her options. "This time," Wachter explained in her deposition, "I wanted to get smart."

3. While this case only incidentally involves Billig's relationship with the Navy and patients other than Wachter, we digress to summarize what the record reveals about an imbroglio that has achieved considerable notoriety. The report of the Navy's Formal Board of Investigation of the Billig affair records a story that, while most disturbing, suggests that Wachter was among the lucky fraction of patients not hurt by Billig's shortcomings.

The report reveals that at least two Navy officers recommended that the Navy hire Billig as a surgeon while withholding or softpedaling information that two civilian health centers had terminated Billig's privileges because of incompetence and lack of diligence and that the Air Force had found Billig unqualified for service because of reduced vision in his right eye. The report found Billig's cardiothoracic surgery mortality rate at Bethesda "unacceptably high", and presented a number of histories of Bethesda

is that she was unable to give her informed consent to the second SVG because Bethesda withheld word of Billig's shortcomings.

Wachter first met Billig in July, 1983, when Billig delivered the results of Wachter's cardiac catheterization and recommended an immediate second SVG. Wachter, having reviewed other facilities and procedures, returned to Bethesda later that month. Wachter was still uncertain whether to accept Billig as her primary surgeon, and proceeded to interview one of Billig's colleagues, Dr. George W. Haggerson,[4] about Bethesda's and Billig's record on second SVGs.

There can be little doubt that Wachter's questions to Haggerson were designed to elicit information about Billig rather than about SVG or alternative procedures.[5] Haggerson recited mortality rates for Bethesda and for Billig that apparently did not alarm Wachter. Wachter stated that Haggerson finished by assuring her that in Billig she "was getting one of the finest doctors in the country ... and it was rather senseless ... to go to outside doctors when [she] had the best right here." There is no evidence that Haggerson then knew anything that should have persuaded him that his statements about Billig were untrue.

The second root of Wachter's grievance, after her conviction that she received harmful misinformation about Billig, is her belief that Bethesda should have told her about an alternative to SVG, the internal mammary artery bypass procedure (IMA).[6] IMA uses chest rather than leg vessels as the graft stock for a coronary bypass.

Dr. Robert D. Brickman, whose affidavits Wachter tendered in opposition to the United States' motion for summary judgment, opined that Billig should have offered Wachter the option of an IMA. Brickman stated that IMA, "although not commonly used throughout the United States in July, 1983, [was] a preferable alternative in selected patients." While Brickman admitted that the question remained unsettled until well after Wachter's second SVG, he opined that IMA could have had a higher chance of success than a second SVG in a patient like Wachter. Brickman's statements make plain that the availability as well as the advisability of IMA for Wachter was problematic in 1983.

Brickman believed that "[p]robably 20 percent" of U.S. hospitals offered IMA in 1983; it is undisputed that Bethesda was

---

patients who had died from what other surgeons opined was Billig's culpable negligence. A Navy court-martial subsequently found Billig guilty of, among other things, dereliction of duty.

4. Haggerson, with Dr. Geoffrey M. Graeber, Director of the Division of Surgery at Washington, D.C.'s Walter Reed Army Institute of Research, and a fourth surgeon, would assist Billig at Wachter's August 1 operation.

5. Wachter does not allege that she received insufficient or incorrect reports about her SVG operations. Wachter did not discuss the SVG with Haggerson because, as she stated, "they [i.e. Bethesda] knew I knew" the particulars from her March, 1983, briefing and her independent investigation. Haggerson related that the second SVG would use veins from the leg not used in the first surgery and that a second SVG imported a higher risk of complications, including death, than had the first surgery.

Wachter stated that she had gotten information on "probably three" surgeons other than Billig before entering Bethesda in late July. On the eves of the March and August SVGs, Wacht-

er signed identical consent forms. Among the form's acknowledgments is that the "possibility of complications [has] been fully explained to [the signatory, who] acknowledge[s] that no guarantees have been made to me concerning the results of the operation or procedure...."

6. Wachter's memorandum in opposition to the United States' motion for summary judgment also argued that Bethesda should have told Wachter of a third alternative, that of angioplasty. Angioplasty is a procedure, less intrusive than SVG or IMA, in which a surgeon maneuvers small balloons into the occluded portions of the coronary blood vessels. When inflated, the balloons compress the occluding material against the walls of the vessels, allowing for improved blood flow and eliminating the need for bypass grafts. Wachter's deposition makes clear that she was familiar with the alternative of angioplasty through her own research, and that she had elected not to pursue the alternative, which Bethesda did not then offer, before entering Bethesda for her second SVG. There is, therefore, no doubt that Bethesda's omission of the angioplasty alternative did not affect Wachter's ability to give informed consent to an SVG.

not among them.[7] In 1983, though, only one facility had compared the success rates of IMA and SVG for patients undergoing a second bypass. Brickman was "not sure of" the results of that study. As to Billig's performance of Wachter's second SVG, Brickman had no opinion whether Billig "deviated from the acceptable standard in the manner and technique employed in the performance of the bypass grafts." [8]

### B.

Wachter, with her husband, Robert, commenced this action on August 6, 1987. The Wachters sought $3,000,000.00 in damages for the failure of Jean Wachter's second SVG. The second set of vein grafts had, like the first, become occluded and unable to transfer blood at a rate sufficient to alleviate Wachter's preoperative symptoms.

Wachter's complaint presented four theories of recovery. The first count generally alleged that Bethesda failed properly to obtain Wachter's informed consent. The second count charged various acts of medical negligence by Bethesda personnel. Counts three and four alleged that Bethesda negligently hired, supervised, and credentialed Billig.

In response to the United States' June 3, 1988, motions for summary judgment and for dismissal for lack of subject matter jurisdiction under the FTCA, the Wachters moved voluntarily to dismiss the last three counts of the complaint and so much of the first count as bore on the first SVG. The district court granted both parties' motions, dismissing with prejudice the bulk of Wachter's complaint and granting the United States summary judgment on Wachter's informed consent objection to the second SVG. We do not understand Wachter to

dispute the district court's construction of the applicable law of informed consent. Our attention is accordingly directed only toward the question of whether any genuine issues exist that should have precluded summary judgment.

### II.

Maryland law supplies the rules of decision on informed consent in this action. 28 U.S.C. § 1346(b). *Sard v. Hardy*, 379 A.2d 1014 (Md.1977), is Maryland's principal elaboration of the doctrine of informed consent. The doctrine "imposes on a physician ... the duty to explain the procedure to the patient and to warn [her] of any material risks or dangers inherent in or collateral to the therapy, so as to enable [her] to make an intelligent and informed choice about whether or not to undergo such treatment." *Id.* at 1020. (Citations omitted).[9] The duty to disclose specifically requires a physician "to reveal ... the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment." *Id.* (Citations omitted). As to what data are significant enough to warrant disclosure, *Sard* held the measure to be that of materiality, of whether a reasonable person in the patient's position would consider the data significant to the decision whether to submit to a particular treatment or procedure. *Id.* at 1022.

In keeping with the tort character of an informed consent action, Wachter is bound to show that Bethesda's breach of its duty of informed consent, if it occurred, caused her harm. *Lipscomb v. Memorial Hosp.*,

---

**7.** Brickman cited the Norfolk [Va.] General Hospital as a facility near Bethesda that offered IMA in July, 1983. Brickman also stated, however, that of "hundreds" of United States medical institutions, "probably about four or five" would have urged Wachter to elect IMA in 1983.

**8.** Brickman candidly admitted that "[t]here's no way that I could comment on [Wachter's] case ... because I was not present in the operating room and, therefore, did not observe what actually took place." Brickman also testified that nothing he had read concerning the second SVG

had led him to suspect surgical error. Similarly, Brickman stated at his deposition that he could not conclude that Wachter has been misinformed or underinformed of the risks attending a second SVG.

**9.** We assume what the parties have not elected to quarrel over directly, that Bethesda, rather than Haggerson alone, stood as Wachter's "physician" for purposes of our analysis of the sufficiency of disclosures concerning Billig.

733 F.2d 332, 338 (4th Cir.1984) (applying Maryland law). *Lipscomb* interpreted *Sard* to articulate three elements of a prima facie case of medical malpractice by failure to obtain informed consent. *Id.* The elements are that: (1) a material, undisclosed risk existed; (2) the risk occurred; and (3) injury flowed from the occurrence. 733 F.2d at 338.

## A.

■ We read *Sard* to leave at issue whether revelations of information about one's physician are within the scope of the duty to disclose as Maryland has chosen to define it. We conclude, however, following the district court, that the evidence speaks with one voice that the failure of Wachter's second SVG does not trace to the competence of Billig and that for another surgeon to have performed the second SVG would not have increased the procedure's likelihood of success. We refer to Brickman's affidavit and deposition and to Graeber's affidavits as the only lode of information about Billig's performance as it bears on this case. Brickman was forthright about his inability to critique Billig's conduct, even though Brickman had reviewed evidence of Wachter's condition after the second SVG. By contrast, Graeber, who had assisted Billig in the August, 1983, surgery, stated that there had been no "notable intraoperative complications" and that the second set of grafts had failed "for reasons not apparently related to the conduct of the [second SVG]."[10] We therefore conclude, following *Sard* and *Lipscomb,* that the district court correctly granted summary judgment in favor of the United States on Wachter's claim insofar as it bears on Billig's competence.

## B.

■ The district court granted the United States summary judgment on Wachter's claim that she should have been told of the IMA alternative based on its conclusions that IMA was not, in 1983, a "medically significant" alternative to SVG and that no credible evidence suggested that IMA would have produced a better result. We agree with the district court that Maryland did not require Bethesda to educate Wachter about every conceivable alternative to a second SVG. This conclusion is implicit in *Sard*'s definition of material information, because a reasonable person would not consider information about experimental or arcane "alternatives" as significant to her decision whether to submit to a recommended procedure. *Lipscomb,* 733 F.2d at 838; *Sard,* 379 A.2d at 1022. Rather than expressly ratify the district court's assessment of the evidence of IMA's significance in 1983, however, we rest our affirmance on our perception that the evidence does not suggest that information on IMA would have prompted Wachter to elect the procedure or that the procedure would have averted the health problems Wachter now experiences.

The only evidence in Wachter's favor on this point is Brickman's affidavit statement that Wachter "was an ideal candidate for an IMA graft." We believe the district court properly discredited this statement as a "bare conclusion." The affidavit does not explain the conclusion. A medical journal article, an excerpt from which accompanies Brickman's affidavit in the record before us, reveals considerable disagreement among surgeons on the relative merits of SVG and IMA.[11] Brickman's deposition also shows that in 1983, only one clinic in the United States had information about the benefits of IMA for a patient whose earlier SVG had failed. Brickman was not sure what results that clinic had witnessed in patients such as Wachter. Brickman remarked that "[t]here's all kinds of stuff in literature subsequent to [that clinic's pioneering turn]", but referred specifically

10. Graeber observed that Wachter's outcome "is often associated with short stature female patients who are obese or have abnormally high serum cholesterol levels" but admitted that he knew "of no definitive means of establishing the precise pathogenesis" of the unfortunate result.

11. The article, entitled *Comparison of Saphenous Vein and IMA Grafts,* appeared in the September, 1980 issue of the *Journal of Thoracic and Cardiovascular Surgery,* and appears to be a transcription of a surgeons' colloquium on experiences with the two procedures.

only to the 1980 article attached to his affidavit and to another paper, apparently the product of the same physicians as contributed to the first, that is not in the record. We do not believe Brickman's evidence suggests that Wachter would have done anything differently had she learned everything known about IMA in 1983.

Even if we assume that Wachter would have sought and been approved for IMA, though, the evidence does not suggest that Wachter would have benefited from the procedure. The evidence tendered by the United States speaks with one voice that Wachter's current health problems do not stem from the sort of bypass procedure used. Graeber noted that "in [Wachter's] case SVG grafting of at least one artery was required, even if IMA grafting was attempted, because of specific perfusion needs." Billig recalled that he did not discuss IMA with Wachter because IMA was "not known to produce a superior result, and required a longer operation ... [Wachter] ... was short and very heavy [and] using an IMA graft would have been very difficult." Like Graeber, Billig averred that Wachter would have had to have at least one saphenous vein graft in the second procedure and stated "it was not advisable to use both IMA and [SVG] because it required a more tedious dissection ... and might have required more blood transfusions." This evidence that IMA would not have benefited Wachter, and the infirmity of Brickman's conclusion that Wachter might reasonably have sought IMA in 1983, persuades us that the district court correctly ruled for the United States on Wachter's IMA claim.

### III.

For the foregoing reasons, we believe the district court was correct to order summary judgment in favor of the United States.

AFFIRMED.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Wachter produced no evidence that Dr. Billig's alleged surgical incompetence contributed to the failure of her saphenous vein grafts (SVG). The district court therefore properly granted summary judgment in favor of the United States on Wachter's claim insofar as it focused on the failure of Bethesda personnel to disclose Billig's purported surgical shortcomings.

However, the district court erred in granting summary judgment against Wachter insofar as she based her informed consent claim on the failure of Billig and other physicians at Bethesda to advise her of the internal mammary artery (IMA) procedure as an alternative to an SVG bypass. Wachter has raised genuine issues of material fact as to the three elements necessary to sustain an informed consent claim under Maryland law: (1) whether the physicians at Bethesda had a duty to disclose the existence of the IMA alternative as well as its risks and prospects for success, (2) whether a causal link existed between Wachter's consent to the SVG bypass and the physicians' failure to disclose information about IMA and (3) whether Wachter suffered any harm as a result of undergoing the SVG procedure rather than the IMA alternative.

In upholding the grant of summary judgment, the majority has overlooked crucial evidence favorable to Wachter and has usurped the function of the fact finder by resolving disputed issues of material fact. For those reasons, I dissent from the majority decision on the IMA issue.

### I. DUTY TO DISCLOSE

I begin with an issue that the majority declined to address, namely, whether the physicians at Bethesda had a duty to inform Wachter of the IMA alternative to the SVG bypass procedure. Maryland law imposes on physicians a duty to disclose the existence of alternatives to proposed surgery or treatment, as well as the risks and benefits adhering to each option, if such information would be "material to the intelligent decision of a reasonably prudent pa-

tient." *Sard v. Hardy*, 281 Md. 432, 444, 379 A.2d 1014, 1022 (1977).

The evidence here would allow a trier of fact to find that a reasonable patient in 1983 would have considered information about IMA material to her decision to undergo bypass surgery.[1] Dr. Brickman, Wachter's expert, testified in deposition that medical evidence in 1983 demonstrated that IMA grafts had superior long-term patency rates (in other words, remained non-occluded or non-obstructed longer) than SVG grafts. Brickman also testified that he and other physicians in 1983 found IMA grafts especially preferable to the SVG option for women, such as Wachter, who had previously experienced blockage of saphenous vein grafts.

The IMA alternative had been used in bypass surgery since at least 1968, and Brickman pointed to medical studies from as early as 1980 indicating that IMA grafts remained patent longer than the saphenous vein grafts. The results of those studies were contained in a 1980 medical journal article which Wachter submitted in support of Brickman's affidavit. In that article, at least one surgeon characterized IMA patency rates as "vastly superior" to those for saphenous vein grafts. *Comparison of Saphenous Vein and IMA Grafts*, Journal of Thoracic & Cardiovascular Surgery, Sept.1980, at 341 [hereinafter *"Comparison"*].

To be sure, many physicians in 1983 apparently disagreed with Brickman over the relative merits of the IMA and SVG options. However, evidence of such disagreement in no way compels summary judgment in favor of the United States. A reasonable patient may find information about an alternative medical procedure material to her decisionmaking even though the medical community is divided over its relative benefits as compared to other surgical options. The medical community need not reach a consensus on the superiority of a particular surgical alternative before a physician has a duty under Maryland law to inform the patient of that option. The doctrine of informed consent in Mary-

land rests on the notion that the patient, not her physician, has the ultimate right to decide what is best for her own body:

> Thus, the appropriate test is not what the physician in the exercise of his medical judgment thinks a patient should know before acquiescing in a proposed course of treatment; rather, the focus is on what data the patient requires in order to make an intelligent decision.

*Sard*, 281 Md. at 442, 379 A.2d at 1021. The patient cannot exercise her "fundamental right of physical self-determination," *id.*, when she is kept in the dark about a medical alternative favored by a significant number of physicians.

Wachter's evidence at a minimum raises a factual question as to the degree of acceptance the IMA option enjoyed in the medical community in 1983. It is impossible to quantify, as a matter of law, the percentage of the medical community that must accept or favor a given alternative before that option becomes "material". That percentage will vary depending on the circumstances of each case. In some cases, a reasonably prudent patient might find a medical alternative material to her decision even though only a minority of the medical community favored the procedure. To require a clear majority of the medical community to prefer a procedure before it could be considered a material option would fly in the face of the decision of the Maryland Court of Appeals in *Sard*, which expressly refused to allow the medical community's view of the significance of a procedure to define the scope of the duty to disclose. *See id.*

Of course, certain procedures may be so experimental or accepted by such a small fringe of the medical community that, as a matter of law, information about them cannot be considered "material" to a reasonably prudent patient's decisionmaking. However, Wachter has produced evidence that as early as 1980 many members of the medical community preferred the IMA option to the SVG for most bypass grafts. Moreover, Brickman's testimony and the

---

1. The case turns on the state of medical knowl-    edge in 1983, the year of Wachter's surgery.

medical journal article submitted in support of his affidavit suggest that even some of the physicians who preferred SVG over IMA for first-time recipients of bypass grafts favored using IMA for patients who had previously received SVG grafts that had failed. At the very least, the evidence raises a question for the fact finder as to whether a reasonable patient in Wachter's position in 1983 would have considered IMA a significant medical option.

That only about 20% of the hospitals in the United States offered the IMA procedure in 1983 does not render irrelevant a belief that a reasonably prudent patient could have considered information about IMA material to her decision to undergo bypass surgery.[2] A patient who faces a serious health risk may wish to know about important medical procedures, particularly those that might prove highly successful, even though only a few hospitals offer such procedures. At any rate, 20% is a significant proportion of the hospitals in the country. That one-fifth of the medical facilities offered IMA strongly suggests that the procedure was neither purely experimental nor isolated to a small fringe of the medical community.

I find unacceptable the district court's argument that, as a matter of law, the choice between SVG and IMA grafts represented a mere "choice of tactical surgical approaches" akin to a surgeon's selection of which sutures to use or the location of an incision, and that Billig and his colleagues therefore had no duty to inform Wachter about the IMA option. *Wachter*

*v. United States*, 689 F.Supp. 1420, 1424 (D.Md.1988).[3] To be sure, some mechanical or technical choices in surgery will be so immaterial to a patient's decisionmaking that, as a matter of law, the surgeon need not discuss them with the patient. The evidence here, however, would allow a trier of fact to find that the IMA option was more than an insignificant tactical choice, but instead was an important medical alternative which a reasonable patient would find material to her decision to submit to bypass surgery. That the medical community actively debated the relative benefits of IMA and SVG well before 1983 suggests that most patients in Wachter's position would have wanted to know about the IMA option before deciding to have a second bypass operation.

The district court misconstrued Maryland law when it suggested that the doctrine of informed consent has no applicability whatsoever when the choice presented is between various techniques of accomplishing a type of operation (*e.g.*, bypass surgery), instead of between surgery and a non-surgical treatment. *See Wachter*, 689 F.Supp. at 1424. *Sard*, the premier case on informed consent in Maryland, clearly demonstrates that a physician may have a duty under some circumstances to inform the patient of the various methods of performing a given operation. That case held, *inter alia*, that a jury could reasonably conclude that a physician had a duty to disclose to a patient the various methods of accomplishing female sterilization through

---

**2.** It is unclear from Brickman's deposition whether he meant that 20% of all hospitals in the United States offered the IMA option in 1983, or instead, that 20% of the nation's hospitals that performed bypass surgery provided the IMA alternative. Whichever Brickman meant, his testimony suggests that IMA was available in 1983 at a significant number of medical centers in the United States.

**3.** Although the recent decision of the Maryland Court of Special Appeals in *Nash v. Raneri*, 77 Md.App. 402, 550 A.2d 717 (1988), quoted extensively from the *Wachter* opinion below, nothing in *Nash* suggests that the Court of Special Appeals intended to endorse the district court's analysis of the evidence or its decision to grant summary judgment. At most, *Nash* illustrates

that Maryland law does not require a physician to discuss every tactical decision in surgery with the patient. I fully concur in that reading of Maryland law. What I find objectionable is the district court's decision to deprive the fact finder of the opportunity to decide whether the IMA was an insignificant tactical surgical choice or, as Wachter asserts, an important medical option that she would have found material to her decisionmaking. *Nash* certainly did not endorse the district court's depriving the fact finder of the opportunity to assess the materiality of the IMA procedure. In *Nash*, the trial court had allowed the jury to decide the informed consent issue, and the Court of Special Appeals agreed that the matter was properly left to the jury. *See* 77 Md.App. at 408–10, 550 A.2d at 720–21.

tubal ligation. *Sard,* 281 Md. at 437, 445–46, 448, 379 A.2d at 1018, 1023, 1024. The physician in *Sard* had informed the patient of birth control methods other than tubal ligation, but had failed to discuss with her the most common methods of performing tubal ligation, even though success rates among the options varied considerably. *Id.* at 437, 379 A.2d at 1018. The facts of *Sard* belie the district court's suggestion that once a physician discloses the alternatives to surgery, he or she never has a further duty to disclose the various methods of accomplishing the operation.

In sum, the evidence in the record raises a genuine issue as to whether a reasonably prudent patient would have considered information about IMA material to her decision to undergo bypass surgery. Were the IMA information material, Maryland law would have required Billig and his colleagues to discuss it with Wachter before performing surgery.

## II. CAUSATION

I disagree with the majority's assertion that Wachter has presented no evidence that she would have chosen the IMA procedure had she received information about it prior to her surgery on August 1, 1983. The majority has ignored crucial evidence in Wachter's favor in reaching its conclusion.

Maryland has adopted an objective standard for determining causation in informed consent cases. No causal link exists between the plaintiff's injury and the physician's violation of the duty to disclose medical alternatives unless a reasonable person in the patient's position would have made a different choice had she been fully informed. *Sard,* 281 Md. at 450, 379 A.2d at 1025. The evidence in the record would support a finding that a reasonable person in Wachter's shoes would have chosen the IMA procedure over the SVG if given a choice.

The majority and the district court improperly dismissed as "bare conclusion" Brickman's assertion that Wachter "was an ideal candidate for an IMA graft." Contrary to the majority's assertion, the record contains abundant support for Brickman's conclusion. Brickman testified that the IMA grafts had a significantly greater patency rate than the SVG. That opinion was echoed by a number of physicians who sang the praises of the IMA option in a medical journal article submitted in support of Brickman's affidavit. Most notably, Brickman emphasized that IMA was especially preferable to SVG for patients, particularly females, who had earlier already experienced failure with saphenous vein grafts.

In concluding that Wachter would not have chosen IMA if given a chance, the majority places too much emphasis on the lack of consensus in the medical community in 1983 as to whether IMA or SVG was preferable for bypass grafts. The majority misperceives the nature of the dispute over IMA. Brickman emphasized that the conflict in the medical literature over IMA focused on the preferable approach for patients receiving bypass grafts for the first time, not on the proper choice for individuals, such as Wachter, who had already experienced failure of a saphenous vein graft. The medical journal article submitted in support of Brickman's affidavit suggests that some physicians who preferred SVG to IMA grafts in first-time bypass operations would opt for IMA grafts the second time around in patients who had experienced SVG failure. For example, the article provides the following summary from Dr. Alexander S. Geha, a skeptic about claims of IMA superiority:

> I really do not see much of a controversy. I do not think that, at present, the difference in results between these two types of grafts is worth the effort of dissecting the IMA and using it *except in patients who have had failure of a previous vein graft* or in whom a relatively high risk of occlusion of a vein graft into a small anterior coronary artery can be anticipated.

*Comparison,* at 339 (emphasis added). Even assuming, *arguendo,* that the evidence here would preclude a finding that a reasonable patient would have chosen IMA grafts for *first-time* bypass surgery,

Wachter's evidence would allow a fact finder to infer that such a patient would have opted for IMA in 1983 for a *second* bypass that was necessitated by previous failure of saphenous vein grafts.

To be sure, the government has presented evidence that the IMA alternative would have made the bypass operation more complicated and perhaps more dangerous than SVG surgery. A trier of fact could permissibly find, however, that a reasonable person in Wachter's position would have chosen to risk the added surgical hazards in exchange for the greater likelihood of long-term success presented by the IMA alternative.

### III. INJURY

Wachter can succeed on her informed consent claim only by showing that she suffered some injury by receiving the saphenous vein grafts rather than the IMA option. Under the circumstances presented here, Wachter need not prove that her bypass grafts would not have occluded had Billig performed the IMA procedure rather that the SVG. To require such a showing where the plaintiff has never received an IMA graft would present a virtually insurmountable barrier to her claim. Instead, Wachter need only show that she would have enjoyed a better chance of success with the IMA grafts than with the SVG.[4]

The evidence here would allow a fact finder to conclude that IMA grafts would have offered a greater likelihood of success for Wachter's second bypass operation than the SVG option provided. Wachter produced evidence that IMA grafts provided greater long-term patency than saphenous vein grafts. Brickman, Wachter's expert, also testified that IMA grafts were a particularly superior option for women who had previously experienced failure with saphenous vein grafts.

I find utterly unsupportable the majority's assertion that the evidence "speaks

with one voice that Wachter's current health problems do not stem from the sort of bypass procedure used." Majority Op. at 11. The majority apparently finds dispositive the government's assertion that Wachter's bypass surgery would have required at least one saphenous vein graft, even if IMA were used. Wachter's evidence contradicts the government's allegation that her surgery could not have been performed with IMA grafts alone. The principal support for the government's contention is Billig's affidavit, which states that "Wachter was having a double bypass (left anterior descending and obtuse marginal grafts) and we could not use IMA for the obtuse marginal graft." Although Brickman never contradicted Billig's assertion that Wachter needed a double bypass, his affidavit does dispute Billig's claim that IMA could not be used for both grafts. Specifically, Brickman declared in his affidavit that:

> The left internal mammary artery can be used to bypass the left anterior descending *or the obtuse marginal branch* of the circumflex artery. The right internal mammary can be used to bypass *either of the same two vessels.*

(Emphasis added).

Even if Wachter's double bypass would have required at least one SVG, that fact would not compel summary judgment in favor of the United States. The majority apparently assumes that had Wachter received both an SVG and IMA graft in the August 1983 surgery, the single SVG would have failed as it had after the first bypass surgery. Even were I to accept that assumption, I cannot agree with the majority's further implicit assumption that Wachter would have been no better off with the combination of a successful IMA graft and an occluded SVG than with two occluded saphenous vein grafts. I respectfully submit that we on the panel simply lack the medical expertise to engage in such speculation, especially in the absence

---

**4.** Perhaps the standard would be different had Wachter undergone a third bypass operation using IMA grafts which subsequently occluded. Such failure of the IMA grafts would present strong evidence that the grafts would also have occluded had she received them in the second operation. However, I have seen no evidence in the record that Wachter had · submitted to a third bypass operation at the time the district court granted summary judgment.

of any supporting evidence in the record. The question is a factual one best left to the trier of fact which would have the benefit of expert medical testimony.

## IV. CONCLUSION

Wachter has raised a genuine issue of material fact as to each of the three elements—duty to disclose, causation and injury—she must prove to succeed on her informed consent claim under Maryland law. I therefore dissent from the majority opinion insofar as it upholds the grant of summary judgment on the IMA issue.