## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 29 2020, 9:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of A.G. (Minor Child), Child in Need of Services, | May 29, 2020 |
| J.L. (Mother), | Court of Appeals Case No. 20A-JC-298 |
| *Appellant*, | Appeal from the Montgomery Circuit Court |
| v. | The Honorable Harry A. Siamas, Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 54C01-1910-JC-272 |
| *Appellee*. | |

**Brown, Judge.**

[1] J.L. ("Mother") appeals the trial court's order adjudicating A.G. to be a child in need of services ("CHINS"). We affirm.

## Facts and Procedural History

[2] A.G. was born in August 2016 and is the child of Mother and R.G. ("Father"). In November 2018, A.G. was seen in an emergency room following a car accident and several dental problems were discovered. Dr. Blair Jones-Bumgardner ("Dr. Jones"), a dentist and pediatric dental specialist, determined A.G. had severe early childhood caries and developed a treatment plan. Dr. Jones removed certain teeth, placed crowns, and noted there were still four smaller cavities which needed to be addressed.[1] The dental office later contacted Mother, Mother asked if all the treatment performed was necessary, she was informed it was necessary because A.G. had a high chance of an abscess and serious infection, and Mother later indicated she would be taking A.G. to another dentist.

[3] On October 17, 2019, the Indiana Department of Child Services ("DCS") filed a petition alleging A.G. was a CHINS and that on October 14, 2019, DCS received a report that A.G. was screaming in pain due to the condition of her teeth and was taken to the emergency room where she received a prescription for the infection. Also on October 17, 2019, the court held an initial hearing at which Father stated he believed A.G. needed immediate care. Zoey Rowe, an

---

[1] During the treatment, A.G. swallowed a crown and it was determined by radiograph that the crown was in the child's stomach and would pass.

assessment worker with DCS, testified that, in October 2019, DCS received a report that A.G. had been prescribed an antibiotic at Riley Children's Hospital because she had an abscess in her mouth. She indicated that Mother told the dentist that she was not giving A.G. the antibiotic. She further indicated the dentist had stated that the abscess, if not treated, could lead to cheek swelling, an abscess in the brain, or possibly death from a blood infection.

[4] Rowe indicated she had a conversation with Mother about the importance of the antibiotic. When asked about Mother's response, Rowe testified: "She at first you know she laughed and said she won't die and then she said I'll just give it to her right now, but it was already after we had had this conversation multiple times in the past even with our last assessment." Transcript Volume II at 12-13. Rowe indicated Mother did not give the antibiotic to A.G. when she was there. When asked if she had a further conversation with Mother about administering the antibiotic, Rowe replied: "She told me that she had not given her the antibiotic at that point. That was the contact that I had with her last night she was swearing at me on the phone while I was dropping her daughter off with her father." *Id.* at 13. She indicated she removed A.G. from Mother on October 16, 2019, and placed her with Father. She also indicated Father lived in Iowa, drove to Indiana every two weeks for visitation, and would temporarily be staying in Indiana. The court found that Father was an appropriate placement for A.G. and ordered Father, in consultation with DCS, to obtain appropriate dental care for her.

[5]     On October 18, 2019, Father took A.G. to an appointment with Dr. Jones. Following a consultation with Father, Dr. Jones performed treatment which included the extraction of three teeth due to infection or large decay and the placement of crowns on two teeth.

[6]     On January 6, 2020, the court held a hearing on the petition alleging A.G. was a CHINS at which it heard testimony from Dr. Jones, family case manager Griffin Flavin ("FCM Flavin"), Father, Mother, and the court appointed special advocate ("CASA").

[7]     Dr. Jones testified that A.G.'s primary care physician had a food log for A.G. due to her low weight and had recommended a dental evaluation. Dr. Jones testified "[s]o there [were] four teeth left to complete treatment a year ago when mom declined to come back to our office," "[o]f those four teeth that were not completed, two of them had abscesses and then two of them needed stainless steel crowns," and "[m]eaning that over the course of the year that mom did not continue with treatment the decay got progressively worse and two actually became infected." *Id.* at 38. When asked about the danger of having an untreated abscess, Dr. Jones replied "[h]ospitalization or death," "[c]hildren especially with a vulnerable immune system and things of that nature, hospitalizations and need for IV antibiotics are very, very high," and "I recently just had a child waiting on a root canal very similar to the infection [A.G.] had actually had to go to the hospital for IV antibiotics because infections can spread so rapidly in children." *Id.* at 39. On cross-examination, Dr. Jones indicated A.G.'s need for emergency dental care has been addressed.

[8]     FCM Flavin testified that he was assigned to the case in October 2019, that Mother indicated she had attended Cummins but did not sign a release of information, and that, when he asked her why she would not release the information to DCS, she said she did not trust its assessment and she had been diagnosed "with PTSD and I believe anxiety." *Id*. at 65. He testified that he supervised eleven or twelve visits between Mother and A.G. and at one point Mother told A.G. that she could not trust anything Father said. He testified DCS was concerned that, if A.G. were returned to Mother, there would be a resurgence of a lack of dental care and Mother would not follow through with doctors' recommendations.

[9]     Mother testified she believed in an all-natural way of raising a child and the foundation of her belief system was that "[t]he food that you eat, the exercise you do, what you do stimulating your body, your spirit, your entire system relies on your whole health, everything you do, fruits and vegetables, basically." *Id*. at 77. When asked "where is the basis for that belief? Is it religious, is it spiritual, what is it, where does it come from," she answered "[a] little bit of all of it philosophical, religious." *Id*. She indicated her belief system was Christian and her denomination was Methodist. Mother testified she was opposed to vaccines but not to antibiotics. She indicated she made appointments with other dentists but did not attend and testified "I had gotten a job, car broke down, lots of bad things in the same situation. [A.G.] was just never unhealthy and I just kept an eye on it." *Id*. at 87. She indicated she allowed radiographs even though she did not believe in them, she had limited financial resources,

earned about $7,000 a year, and worked at a newspaper and a restaurant. On cross-examination, when asked about the basis for her beliefs about "fluoride, antibiotics and such," Mother answered "the basis of this is that I was on Xanax and pain pills from ten to twenty-eight years old and it destroyed my brain health and since then I have learned to live a proper life without coca cola and Totino's pizzas and drugs to fulfill just waking up in the morning." *Id.* at 90-91. When asked if she had mental health issues, she answered: "Before I met [Father] I had generalized anxiety disorder. After that relationship, post-traumatic stress disorder." *Id.* at 100. She indicated she was treating those issues through exercise, acupuncture, and therapy with Cummins Mental Health.

[10]   DCS's counsel argued that A.G. had a prescription from the hospital to treat her infection, Mother was not giving the prescription to A.G., and DCS had to remove A.G. so that she would receive treatment and follow-up care. She further argued that, even if Mother had certain beliefs, there was an exception for when a child is placed in a life-threatening situation and that A.G. would not be safe and Mother would not participate in necessary services without the intervention of the court.

[11]   The CASA testified that Mother's "decisions for medical care are eccentric at best and do pose a danger to the child should she become ill." *Id.* at 111. The CASA also testified she did not think it would be safe, at this point, to return the child to Mother's care.

[12] The court stated Mother had a right to her belief system until A.G. was placed "in very serious jeopardy and that's what happened here." *Id*. at 112. It also found "[t]he dental risk is over for now, but it wasn't taken care of by mother it was taken care of by father and the DCS" and it had "to assess whether the coercive intervention of the court is necessary going forward to ensure that the child will receive appropriate medical and dental care." *Id*. at 113.

[13] The court issued an order finding A.G. to be a CHINS and providing:

> 1. Mother's actions seriously endangered her daughter, refusing to take care of child's dental issues.
>
> 2. In November 2018, [M]other took child to Dr. Jones for dental care but her reaction when child swallowed the crown requiring another x-ray by not following up to complete the 4 cavities was neglect: child had developed abscesses in the untreated cavities in November 2019.
>
> 3. Doctor believed that if the abscesses had not been treated, child was at risk of dying.
>
> 4. Mother's beliefs placed the child in serious jeopardy.
>
> 5. Father saw the condition of the child's mouth and asked [M]other to get the child dental care and mother said she would take care of it.
>
> 6. Child's dental issues have been resolved by the care of [Father] and DCS; therefore, coercive intervention of the Court is needed.
>
> 7. Mother cannot put aside her beliefs to keep the child safe. She needs services to educate her and rehabilitate [M]other to protect the child.
>
> 8. [M]other's mental health issues prevent her from understanding or parenting appropriately.

Appellant's Appendix Volume II at 13-14. An entry in the chronological case summary indicates the court held a disposition hearing, ordered that A.G.

should continue placement with Father under DCS supervision, approved recommended services, stated the permanency plan is reunification and Mother's visitation would continue to be supervised at this time, and set a review hearing.

*Discussion*

Mother claims the trial court erred in concluding A.G. was a CHINS. She argues that her rights to religion and conscience were violated as the court did not properly consider Ind. Code § 31-34-1-14, "[t]here is no statement in the statute that placing a child in serious 'jeopardy' qualifies that child to be in need of services," and she believes in an all-natural approach to health. Appellant's Brief at 19. She also argues the reasons for removal had been resolved by the time of the hearing.

We do not reweigh the evidence or judge the credibility of witnesses and consider only the evidence which supports the trial court's decision and reasonable inferences drawn therefrom. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied.* We apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *Id.* Ind. Code § 31-34-1-1 provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with

necessary food, clothing, shelter, medical care, education, or supervision:

> (A) when the parent, guardian, or custodian is financially able to do so; or
>
> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and

(2) the child needs care, treatment, or rehabilitation that:

> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

The CHINS statute does not require a court to wait until a tragedy occurs to intervene. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id*. The purpose of a CHINS adjudication is to protect children. *Id*.

[16] Ind. Code § 31-34-1-14 provides:

> If a parent, guardian, or custodian fails to provide specific medical treatment for a child because of the legitimate and genuine practice of the religious beliefs of the parent, guardian, or custodian, a rebuttable presumption arises that the child is not a child in need of services because of the failure. However, this presumption does not do any of the following:
>
> (1) Prevent a juvenile court from ordering, when the health of a child requires, medical services from a physician licensed to practice medicine in Indiana.
>
> (2) Apply to situations in which the life or health of a child is in serious danger.

Although an adult generally cannot be forced to undergo medical treatment against his religious principles, a parent's decision to refuse lifesaving medical treatment for a minor child must yield to the State's interest in protecting the health and welfare of the child. *Schmidt v. Mut. Hosp. Servs., Inc.*, 832 N.E.2d 977, 982 (Ind. Ct. App. 2005).

[17] To the extent Mother does not challenge the trial court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied.*

[18] With respect to Mother's argument regarding Ind. Code § 31-34-1-14, although the trial court's order did not use the term "serious danger," the court found that Mother's beliefs placed A.G. in "serious jeopardy" and also found that her actions "seriously endangered" A.G., *see* Appellant's Appendix Volume II at 13, and it is clear the court considered the statutory exception and determined that DCS met its burden. The evidence as set forth above and in the record, including the testimony of Dr. Jones, supports the court's finding, and we cannot say reversal is required on this basis.

[19] As for the argument the reasons for A.G.'s removal had been resolved, the record shows that A.G. received treatment following the intervention of DCS and the court. The court specifically found that Mother cannot put aside her beliefs to keep A.G. safe and needs services so that she can protect A.G. and that her mental health issues prevent her from parenting appropriately. To the

extent Mother invites us to reweigh the evidence and judge the credibility of witnesses, we are unable to do so. *See In re S.D.*, 2 N.E.3d at 1286. The court was able to consider Mother's actions and omissions over time and ability to protect A.G. The court's findings and adjudication of A.G. as a CHINS are not clearly erroneous.

[20] For the foregoing reasons, we affirm the trial court's order.

[21] Affirmed.

Najam, J., and Kirsch, J., concur.